ELISHA W. WILLARD *et al.*

*v.*

GEORGE BOGGS.

1. STATE OF WAR — *absence of debtor in enemy's country — suspension of creditor's rights thereby.*   The last of a series of notes secured by mortgage upon lands lying in this State, having matured in September, 1861, an assignee of the notes and mortgage, who resided in this State, in pursuance of a power contained in the mortgage, in November following sold and conveyed the mortgaged premises to a third person.   In May, 1860, prior to the maturity of such note, the mortgagor went to New Orleans, where he remained until June, 1862, when the city was occupied by the Federal forces, and soon after he returned to this State: *Held,* that neither the contract of indebtedness nor the power of sale was suspended during the debtor's residence within the confederate lines, so as in anywise to affect the validity of the sale made during that time.

2. SAME — *effect of the prohibition of commercial intercourse during the late rebellion.* As was held in *Mixer et al.* v. *Sibley et al.*, 53 Ill. 61, the act of congress of July 12, 1861, empowering the president to prohibit, by proclamation, all commercial intercourse between the rebellious and the loyal States, and the proclamation of the president in pursuance thereof, issued August 16, 1861, prohibiting such intercourse, were not designed to deprive creditors in the adhering States of the use of all such remedies for the collection of their debts, as the laws of those States gave them.

3. REDEMPTION *from sale under power in a mortgage — as against a third person — where the debtor resided within one of the rebellious States.* Where a sale of land was had under a power of sale in a mortgage, at a time when the mortgagor was residing in one of the rebellious States, during the late war, and the purchaser at such sale was a stranger to the mortgage, without notice of any reason why the power could not properly be exercised, he would be protected against any claim on the part of the debtor to a right of redemption based upon the fact of the inability of the latter to communicate with his creditor; and the same protection would be accorded to a *bona fide* vendee of such purchaser, although he held the mortgage by assignment at the time of the sale.

APPEAL from the Superior Court of Chicago.

The opinion of the court contains a sufficient statement of the case.

Messrs. GOUDY & CHANDLER, for the appellants.

A power of sale contained in a mortgage was not suspended by reason of the residence of the debtor in one of the States in rebellion, during the existence of hostilities in the late war. This is settled under the rule in the case of *Mixer* v. *Sibley*, 53 Ill. 61. See, also, *Dorsey* v. *Dorsey*, 30 Maryland, 522.

Moreover, the laws of war did not apply at the time of the sale and conveyance in this case, November 5, 1861.

For the purpose of discussing this point, we admit that a war between different nations would destroy the right of a mortgagee to enforce his security against the property of one in the enemy's country. It is a matter of grave doubt whether the international rules of war apply to a civil war, to the full

extent. The supreme court of the United States has held that the late rebellion was such a war as authorized the capture of property on sea and land, and that the limitation law of the State was suspended by it. Other courts have extended the rule to other cases. But it is not material in this case to fix the limits on that subject.

It is settled beyond controversy that the sovereign of a nation may apply the laws of war with full vigor, yet he may and does relax them. In a civil war, such rules are only partially applied as the progress of the insurrection requires; they are not to be considered as in full force *ipso facto*, but only so far as declared from time to time.

The history of the late rebellion in this country illustrates and proves this proposition. First, the government treated the insurrection as existing only among certain persons, and all others were regarded as loyal. Provisions were constantly made recognizing the existence of loyal citizens within the seceding States; they were not treated as enemies. From time to time congress extended more rigorous rules as the exigency demanded, but at no time were all the inhabitants of the States in insurrection treated as rebels.

These doctrines are fully recognized in *Allen* v. *Russel et al.*, 3 Am. Law Reg. 366 ; *Filor* v. *United States*, 3 C. Claims R. 34 ; *Fairfax Devisee* v. *Hunter's Lessee*, 7 Cranch, 603 ; *Clarke* v. *Morey*, 10 Johns. 69 ; 3 Wash. C. C. 484.

The government of the United States had not, prior to November 5, 1861, established any rule which would prevent the sale and deed under the provisions of this mortgage. In the case of *Allen* v. *Russel et al.*, it was expressly decided that a deed made November 29, 1861, by persons in actual rebellion, to a loyal person, of property in Kentucky, was valid.

The proclamation of the president, of August 16, 1861, prohibiting all commercial intercourse between persons in the States in rebellion and those in the loyal States, did not embrace the case of the resort to the remedy afforded by the contract of the parties.

Mr. Edward S. Isham, for the appellee.

The breaking out of war operates to suspend all contracts existing between the residents of the hostile countries; such contracts, and all right to enforce them, are suspended and put in abeyance until the return of peace; interest ceases to accrue during the same period; and by the laws of war all pacific intercourse between the people of the contending nations is absolutely prohibited. *Semmes, admr.,* v. *The City Fire Ins. Co.,* in U. S. Cir. Co. for the District of Connecticut, reported in 2 Chicago Legal News, 17; *The Prize Cases,* 2 Black, 678; *Griswold* v. *Waddington,* 16 Johns. 447; *The Rapid,* 8 Cranch, 160; *The Julia,* id. 193; *Hanger* v. *Abbott,* 6 Wall. 535; Wheaton's International Law, by Lawrence, 551, 556.

The rule by which pacific intercourse was interdicted and contracts were suspended had the same force and effect in the late civil war, both by virtue of the general law and by force of the proclamation of the president, as in a foreign war. *Semmes* v. *Ins. Co.,* before cited; *The William Bagaley,* 5 Wall. 407; *The Ouachita Cotton,* 6 id. 521; *Hanger* v. *Abbott,* id. 535.

In the case of *Mixer* v. *Sibley,* 53 Ill. 61, the creditor had invoked the aid of the civil courts. In the case at bar, however, there was no intervention of a court of justice. The holder of the notes and mortgage took his case into his own hand, and advertised the property for sale under a power of attorney. He went through a proceeding deriving all its right from the terms of a suspended contract. By the rules of international law, the debt could not become due while the debtor was absent within the rebel lines. *Baylies* v. *Fettyplace,* 7 Mass. 325; *Quick* v. *Sturtevant,* 2 Paige's Ch. 91; *Hatchett* v. *Pattle,* 6 Madd. Ch. 11; 1 Story's Eq. Juris., § 93.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

On the 25th of September, 1857, James Boggs, George Boggs and Redmond Cotter, then residents of Chicago, executed a mortgage to Julius Crane and William P. Apthorp, of certain premises, situate in Cook county, to secure the payment of four promissory notes of even date, each for $1,400, due in one, two, three, and four years.

Cotter afterward conveyed to the two Boggs, and they became the sole owners of the equity of redemption.

The last note having fallen due September 25, 1861, and it and a portion of the third note remaining unpaid, to satisfy the payment of the same, on the 5th day of November, 1861, Willard, the assignee of the notes and mortgage, sold and conveyed the mortgaged premises to George Smith for $300, in pursuance of a power of sale contained in the mortgage, authorizing the mortgagees or their assigns, in default of payment of the notes, or either of them, to sell the premises for their payment, after publishing a notice in a newspaper in Chicago for thirty days. July 14, 1862, Smith sold and conveyed the property to Willard, for $334.

George Boggs left Chicago in May, 1860, and went to New Orleans, where he remained until June, 1862, when the city was occupied by the Federal forces. He soon after returned to Chicago, via New York.

After the sale, Willard took possession of the land, and has held it ever since, and paid all taxes.

James Boggs has acquiesced in the sale, and makes no question as to Willard's title. But George Boggs commenced this suit in chancery, on the 26th day of October, 1868, to declare the sale void as to him, and to permit him to redeem an undivided half of the property.

The court below rendered a *pro forma* decree as prayed in the complainant's bill.

To reverse the decree, the defendants bring the record here, assigning this decree as error.

There is no pretense that the sale and conveyance of the mortgaged premises in this case by Willard to Smith were not in entire conformity with the power of sale contained in the mortgage; but the ground of the claim to relief is, that, at the time of such sale, and of the maturity of the last note, George Boggs was within the territory then occupied by the confederate forces in the late rebellion; that while the war and the complainant's residence within the confederate lines continued, the contract of indebtedness was suspended; that it was unlawful for the complainant to pay, and for Willard to receive payment, and that the power of sale was suspended; that these effects resulted from the laws of war, and the proclamation of the president prohibiting all commercial intercourse between the rebellious and the loyal States, issued August 16, 1861, in pursuance of the act of congress of July 12, 1861, empowering him to do so; in consequence of which, it is claimed that the sale to Smith was void, and that the equity of redemption still exists in George Boggs.

The decision of this court in the case of *Mixer* v. *Sibley*, 53 Ill. 63, is adverse to the claim here set up.

It was held, in that case, that proceedings by attachment, in 1862, for the collection of a debt, on the part of a creditor living in this State, against a defendant who resided in Alabama, a State then in rebellion against the United States, notice of the pendency of the suit having been given by publication in a newspaper, which resulted in a judgment by default and sale of the property attached, were not void, and were not suspended by the state of war. It is there said, "No authority has been or can be shown, that the right to the writ was taken away by the rebellion, or by act of congress, or by the president's proclamation consequent thereupon.

Such was not the object of either. Neither was designed to deprive creditors in the adhering States of the use of all such remedies for the collection of their debts as the laws of those States gave them."

As in that case, the remedy for the collection of the debt by

writ of attachment was not taken away, so here, the remedy for the collection of this mortgage debt by the exercise of the power of sale given in the mortgage was not taken away. It may be said, as it was there, that the question is not whether the sale might not have been stayed until the termination of the war, but whether, not having been stayed, and the power of sale having been actually exercised by the sale of the premises to a third person, is that sale void? The court went so far only in that case as to hold that the efflux of time as to redemption from the sale under execution was suspended during the continuance of hostilities, and to allow the judgment debtor, after the expiration of the time for redemption, to redeem from the judgment creditor, such land as he had purchased under the execution sale as remained in his hands, but denied that, or any relief, as against purchasers from the judgment creditor, holding their equities to be equal to those of the complainants.

It is admitted by the counsel for the appellee that the sale to Smith and the reconveyance by Smith to Willard, were *bona fide* and for actual consideration paid, as was sworn to in the answer of Willard, called for under oath, or at least it is admitted that the contrary is not proved.

Under the principle of the above decision, had this sale been under a decree of foreclosure in a suit in court, with notice by publication, it would have been sustained.

We think the sale under the power in the mortgage must be entitled to equal force. In the one case it would have been in pursuance of law, in the other it was in pursuance of the contract between the parties, which was as a law between themselves.

The sale here was under the precise conditions Boggs, by his deed, authorized it to be made. But he claims that the power of sale was suspended by an event which had occurred *aliunde*, to wit: his being, by his own voluntary act, in another State at the time the last note fell due, and the publication of notice and sale were made, where he was cut off

from all means of access to his creditor to pay the debt, and shut out from the receipt of any newspaper notice of the sale. But neither Willard nor Smith appear to have had any knowledge of the whereabouts of Boggs, and no duty was imposed upon them to ascertain it.

Boggs was free to annex his own conditions to the power of sale, and he might have provided that it should not be exercised in such a contingency as here occurred, in which case, Smith would have been put upon inquiry, by the terms of the power of sale, to ascertain whether it existed or not. Boggs, by his deed of mortgage, made a conveyance of the legal title, and saw fit to give therein an irrevocable power of sale, to sell the equity of redemption, on two conditions only, the non-payment of the debt after its maturity, and publication of thirty days' notice of the sale, in a newspaper printed in Chicago.

When Willard, in execution of the power of sale, offered the mortgaged premises for sale, Smith saw that both the conditions required for the exercise of the power existed; he had no notice of any thing to affect the proper exercise of the power, and he was entitled to act on the faith of the power given by Boggs, and to lay out his money in the purchase of the property, in confidence that he was acquiring all the interest of Boggs in it.

The same reason of public policy exists for giving security to titles derived under such sales, as under judicial sales. Were they liable to be invalidated on any such grounds as are set up in this case, it would tend to discourage purchases at such sales, and lead to the sacrifice of property so exposed for sale.

Certainly, no greater effect should be given to this supposed suspension of the power of sale, claimed to have been caused by the facts set forth, than would be given to an actual revocation of a power by the principal. Had the power of sale in this case been a revocable one, and Boggs had actually revoked it, a subsequent sale of the property to a third person

in pursuance of the power, who had purchased on the faith of it, without any notice of the revocation, would bind the principal, Boggs.   Story on Agency, § 470.

If the complainant has suffered by the sale of his property, it has only been in consequence of what he himself expressly contracted and authorized to be done.   The defendant, Smith, has parted with his money for the property, in reliance upon the express written authority to sell it, given by the complainant, without notice of any reason why the power might not properly have been exercised, acquiring an apparently perfect title by the record.   On comparison of the equities between the parties, we can perceive no just claim on the part of the complainant, which entitles him to take from the defendant a title acquired under the circumstances of the present case.

We think the bill should have been dismissed.

The decree *pro forma* is reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*