## HORATIO SEYMOUR *et al.*

*v.*

## JOHN F. BAILEY *et al.*

1. CIVIL WAR—*jurisdiction of courts in suits affecting property of defendants in rebellious States.* The existence of the late civil war, and the President's proclamation issued in pursuance of an act of Congress, prohibiting all commercial intercourse between the citizens of the rebellious, and those of the loyal States, did not suspend the operation of our statutes authorizing the prosecution of suits against non-resident defendants domiciled in the rebellious States, in respect to their property situate in this State, by publication of notice, so as to deprive the courts, in such cases, of all jurisdiction.

2. SAME—*collection of debts secured by mortgage as against non-resident enemy.* While it is true that during the existence of war all intercourse and dealing between the respective citizens of the belligerent States are unlawful, yet a friendly citizen is not thereby deprived of the right of enforcing the laws of this State so as to subject the real estate, within its limits, of a non-resident enemy, to the payment of a debt contracted before the war began, and secured by a mortgage upon the property itself.

3. SAME—*disability and liability of alien enemy.* The character of alien enemy carries with it simply a disability to *sue;* and whatever may be the extent of such disability to sue in the courts of the hostile country, it is clear that he is liable to be sued, and this carries with it the right to use all the means and appliances of defense.

4. CHANCERY—*relief against decree on account of the accident of war.* Where a decree for the foreclosure of a mortgage on real estate was rendered in March, 1862, upon notice by publication to the mortgagor, who was at the time a resident of the State of Alabama, and who claimed that owing to the war he did not receive notice of the pendency of the suit, and was unable to make any defense, and it appeared that in 1863 he went to Havana, in Cuba, where he was free to come north and defend the suit, and that in attempting to run the blockade, on his return home, with contraband articles, he was captured by the United States, and confined as a prisoner until in June, 1865; that he was notified by letter of the proceedings in the spring of 1864, and that he visited this State in September or October, 1865, and learned of the foreclosure: *Held,* on bill by the mortgagor to redeem from the foreclosure and sale, filed in December, 1868, on the ground of the impossibility of receiving and obeying the published notice of the suit, that as the decree did not become absolute until three years after its rendition, and might have been opened within

that time under the statute, and the party had ample time, after receiving actual notice, to have done so, he was not entitled to the relief sought.

5. LIMITATIONS—*suspension of by war.* The fact of inaccessibility or inability to sue seems to be the true reason why statutes of limitation are suspended during a time of war. The disability to sue which attaches to the character of alien enemy, continues only while the party is abiding in his own country. Therefore, if a party residing in a seceding State at the commencement of the late hostilities, should voluntarily leave his State and go into a foreign State or come to this State, it would seem that his disability to sue would cease.

6. SAME—*opening decree under 15th section of chancery act.* An application by a non-resident defendant under section 15 of the chancery act, to open a decree and be allowed to defend, being a defensive proceeding, is not affected by the rule which prohibits an alien enemy from suing in the courts of this State, and therefore the accident of war affords no ground for suspending the limitation of three years in which such application must be made.

7. PUBLICATION — *sufficiency of affidavit of non-residence of defendant.* It was insisted that an affidavit of the non-residence of the defendants in a suit in equity was insufficient, because it was entitled A B *et al. v.* C D *et al.*, instead of giving the full names of the parties, and that advantage could be taken of such defect on bill of review, but it was *held* that the affidavit was sufficient.

8. CHANCERY—*relief against decree and sale on the ground of promise of an extension of payments.* Where a creditor assented to an extension of the time of payment of a debt secured by mortgage, but no definite time was fixed, and suit was not brought by the creditor for nearly three years and a half afterwards, and the debtor, long before suit, had written, intimating that if his State should secede, he would go with her, and would not resume his payments, and the facts showed that he made no effort to pay when he could: *Held*, on bill by the debtor to redeem from the sale under the mortgage, that the creditor was under no duty to notify him before instituting proceedings to foreclose, and that such assent to extend the time of payment afforded no equitable ground for relief.

9. SAME—*relief against decree and sale on ground of suit by stranger in U. S. court against complainant in decree.* In this case the complainant purchased land of A, giving mortgage to secure the deferred payments. After his purchase, without notice of any equitable claim to the land, the administrator of B filed his bill in equity in the U. S. circuit court, alleging that this and other lands had been purchased by A with funds furnished by B, on a speculation, to be afterwards sold, and, after repayment of the outlay with interest and taxes, one-half of the residue was to be paid B, and praying for an account, and that the unsold lands be sold, and for an injunction against A making further sales. No injunction was in fact

19—66TH ILL.

ever issued or receiver appointed. The complainant was not a party to this suit. During the pendency of this suit, and during the late war, A foreclosed the mortgage, and the premises were sold and purchased by him. After the time of redemption had expired, the complainant filed his bill in chancery to open and set aside the decree of foreclosure and sale and for redemption of the land: *Held,* that the pendency of the suit in the U. S. circuit court afforded no excuse to the complainant in not making his payments, and did not have the effect to deprive the courts of this State of jurisdiction to decree a foreclosure of the mortgage, and consequently was no ground for equitable relief against the proceeding to foreclose.

APPEAL from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

This case and the one following, of Horatio Seymour *et al. v.* John F. Bailey *et al.,* were suits in equity, brought in the Superior Court of Cook county by the appellees against appellants, to redeem lands in Cook county from sales made, one June 17, 1862, and the other November 22, 1862, under decrees of foreclosure of mortgages upon them entered in said court. The records in the cases are substantially alike, with the difference as to description of land and amounts due.

The material facts are substantially as follows: On the 21st of February, 1857, Horatio Seymour and others, heirs of Henry Seymour, conveyed to John W. Davis, of Mobile, Alabama, a part of the north half of the south-east quarter of section 12, T. 39, R. 13 E., in Cook county, and Davis made a mortgage back to secure the unpaid purchase money, then amounting to about $27,000, omitting from the mortgage a five acre block. The purchase had been made in December, 1855, for $48,000.

This block, together with another one subsequently released from the mortgage, Davis sold for $22,500. The mortgage secured Davis' bond for the following payments:

January 25th, 1858, $9000 principal and $1620 interest.
January 25th, 1859, $9000 principal and $1080 interest.
January 25th, 1860, $9000 principal and $540 interest.

At the same time, February 21st, 1857, the Seymours conveyed to Davis the east half of the south-west quarter of section six, T. 38, R. 14, in said county, and Davis gave to them a mortgage to secure the deferred payments thereon ($2000 having been paid) as follows:

February 21, 1858,........................ $2000.
   "      "   1859,........................ $2000.
   "      "   1860,........................ $2000.
   "      "   1861,........................ $2000.
   "      "   1862,........................ $2000.

with interest on the sums.    About the time Davis purchased the land in section 12, he bought of the Seymours a half interest in a part of section 36, for the sum of $9000, the last installment of which he paid in December, 1858.

On the 26th of January, 1858, Davis paid A. C. Coventry, for the mortgagees, at Chicago, $10,620, being the first installment due on the mortgage upon land in section 12. This was the last payment Davis ever made on these mortgages. He paid the taxes on the mortgaged lands for the year 1859, and never paid any afterwards.

By the terms of the mortgages, in case of any default in payment of either principal or interest for thirty days after the same became due, then the whole principal money and interest should become due and payable, and the mortgagee might foreclose the mortgages by advertisement, upon giving thirty days notice of the time and place of sale, in the manner ordinarily provided in mortgages, with a power of sale.

On the 16th of December, 1861, the Seymours commenced suits in the Superior Court of Chicago for the foreclosure of these mortgages, and decrees afterward were obtained.    The decrees entered were by default, due publication of notice, as in case of a non-resident defendant, having been made, the affidavit of non-residence stating that Davis was, at the time, a resident of the State of Alabama.

These bills to redeem from the sales made under these decrees were filed on the 3d and 5th days of December, 1868, in the names of Bailey and Pierce, assignees in bankruptcy of Davis, who went into voluntary bankruptcy in December, 1867.

The reasons assigned in the bill why the redemption should be allowed from the sales under the decrees of foreclosure, are, that the foreclosure suits were brought against Davis while he was a citizen and resident of Alabama, and that he was only notified of the pendency of the suits by publication in a Chicago newspaper, as in case of non-residents in chancery; that the existence of the war of the rebellion at that time rendered all the proceedings void; that there had been an extension of the times of payment of the mortgage debts; and, as a further reason, the pendency of the Price suit against the Seymours, which is noticed in the opinion.

The only important evidence offered by either party was the testimony of Davis, his letters, the records of the foreclosure suits, and of the Price suit. The lands under the foreclosure sales were bought in, and are still held, by the mortgagees.

Davis was examined in March, 1870, and testified that on the 26th of January, 1858, he paid A. C. Coventry, at Chicago, Illinois, $10,620, being the first installment due on the mortgage upon land in section 12; and that when he made the payment he stated to Coventry he feared he should not be able to meet the future payments as they became due, and might want an extension; to which Coventry replied that the funds which Davis had paid him were tied up by proceedings in court against the Price and Seymour estates, and it would be better for the Seymours if the payments were not made, as they would lose the interest.

That in the winter of 1858–9 he called on Horatio Seymour, at Washington, D. C., to ask for an extension of his payments, and that Seymour referred him to his brother, John F. Seymour, but stated that he (Horatio) had no wish to embarrass him, and would be willing to give him a longer time. In

the summer following, Davis saw John F. Seymour in the city of New York, and applied for an extension of time to pay these mortgages; and in the words of the witness, "at this interview John F. Seymour expressed himself satisfied with the promptness with which I had before made my payments, and was not disposed to press me in these payments, and that they had no objection to giving the extension, and he then assented to it. No definite time was agreed upon. I do not pretend to give the exact language used in this interview, but only the substance." After this, Davis returned to Mobile, and, as he says, "rested satisfied," and did not make any further payments on the mortgages. About the commencement of the political troubles between the north and south, he says he received a letter from Coventry. Davis' reply to this letter was dated Mobile, November 20th, 1860, in which he says: "I had intended offering to resume payments, making them every ninety days, from $1000 to $1500; but the result of the election, I fear, will prevent. I am at my old business, and have a fine prospect, but the times look decidedly bad now. You ask my opinion as to Alabama secession. I think that there is no doubt but that she will go for secession strong." The letter continues, and concludes with some political comments; the last paragraph but one of the letter is this: "If a majority go for secession, I must go with them, for they are in the right."

The following is a copy of a letter from Davis to John F. Seymour:

MOBILE, March 9th, 1858.

DEAR SIR: I had some conversation with Mr. Coventry in reference to an extension of time on the payment due February 21st—($2600.) Also with your Bro. at Washington. I would ask for six months' extension, but would state that I may be prepared to pay it earlier. Am anxious to pay it as early as possible. My payments to you and Douglass the last

fall and winter came very hard, as I had to give extension to parties in debt to me, and raised money by sacrificing to meet those."

Davis was not in active business in 1856 and 1857, but resumed business at Mobile in 1859, which was good and profitable up to 1861, and still more so after the war began. He testified that he was never asked to make any payments on the mortgages, or notified that he was expected to make them, nor that he knew of the foreclosure proceedings until some time in the spring of 1864, when he received a letter from Mr. Watson, in which there was some intimation that some proceedings had been instituted against him by the Seymours. Mobile was blockaded in the latter part of 1861. In July, 1863, Davis owned one-sixth of a cargo of cotton with which he ran the blockade and went to Cuba, and attempted to bring back meat, salt, etc., having a small interest in the return cargo. On his attempted return from Cuba to Mobile, in September of the same year, he was captured as a prisoner of war by a United States steamer and taken to New York city, and confined in Forts Lafayette and Warren until in June, 1865, when he was released as a prisoner of war.

When he left for Cuba he had about $60,000 worth of lumber, and a plantation near Selma, Alabama, worth $20,000. From the commencement of the war until he went to Cuba, he was in Mobile or the State of Alabama. He visited Chicago in September or October, 1865, but did not find Coventry there. He learned from Watson that the Seymours had some difficulty with the Price estate, which prevented, for the present, any arrangement, as Watson supposed. He says at this time he could have raised the money to pay these mortgages if he could have made arrangements to pay them. He then engaged at New Albany, Indiana, with other parties, in building two steamboats to run from Mobile to New Orleans, which were put into that line, and continued in the

business until December, 1867, when the firm of which he was a member failed.

There was an admission that all of the mortgaged premises were sold in 1861 for the taxes of 1860; that the certificates of sale were taken up by the heirs of Seymour, and that they have paid the taxes since. The court below decreed for the complainants, and the defendants appealed from the decree.

Mr. SAMUEL W. FULLER, Mr. THOMAS HOYNE, and Messrs. MILLER, FROST & LEWIS, for the appellants.

Messrs. WAITE & CLARKE, and Mr. JOHN N. JEWETT, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The position is taken by the appellees that the existence of the late war of the rebellion, and the President's proclamation of August 16, 1861, prohibiting all commercial intercourse between citizens of the rebellious and those of the loyal States, issued in pursuance of the act of Congress of July 12, 1861, had the effect, as to all defendants domiciled in the rebellious States, of suspending the operation of our statutes authorizing the prosecution of suits against non-resident defendants, in respect to their property situate in this State, by publication of notice of the pendency of the suit in a newspaper, so as to deprive the courts, in such cases, of all jurisdiction, and to render their proceedings null and void.

The contrary of this position was decided by this court in the case of *Mixer* v. *Sibley*, 53 Ill. 61, and the doctrine of that case has been re-affirmed in the two subsequent cases of *Willard* v. *Boggs*, 56 Ill. 163, and *Harper* v. *Ely*, ib. 179. But we are asked to reconsider the question, in view of a subsequent supposed adverse decision of the Supreme Court of the United States in the case of *Dean* v. *Nelson*, 10 Wallace, 158, and which is claimed to be of controlling effect upon a question of such a character. We have examined the case of

*Dean* v. *Nelson* in connection with the subsequent one of the same court, *Ludlow* v. *Ramsey*, 11 Wallace, 581, decided at the same term. Both were cases of bills in equity for relief against judgments by default, against defendants similarly circumstanced as Davis was here, and where there was only constructive notice by publication in a newspaper. Relief was granted in the former and denied in the latter case. The difference between the two cases is thus commented on in the latter opinion : " In that case (*Dean* v. *Nelson*) Nelson and his wife were driven out of Memphis by a military order, and were not permitted to return, and the proceedings to foreclose their property took place during their enforced absence. The other defendant, May, was only nominally interested, and had always been within the confederate lines. But if, as in this case, a party voluntarily leaves his country or his residence, for the purpose of engaging in hostilities against the former, he can not be permitted to complain of legal proceedings, regularly prosecuted against him as an absentee, on the ground of his inability to return or to hold communication with the place where the proceedings are conducted." There is here no denial of jurisdiction in case of such proceedings, but rather an implied admission of jurisdiction, and that the proceedings are not void, but only constitute ground for equitable relief, to be granted or denied according as all the circumstances of the case may show an equitable claim to the relief asked.

We do not regard the doctrine of that court as deduced from these cases, taken together, as inconsistent with that laid down by this court in *Mixer* v. *Sibley*.

We have been favored, in the argument, with a learned discussion, and the citation of much authority upon the general doctrine, that during a time of war, all intercourse and dealing between the respective citizens of the belligerent States are unlawful, and that the remedy for the collection of debts is suspended; but we fail to perceive in it all a denial of the right here asserted by appellants, that of a friendly citizen to enforce the laws of this State, in the courts of this State, so

as to subject the real estate within its limits, of a non-resident enemy, to the payment of a debt contracted before the war began, and secured by a mortgage upon the property itself. The remedy is suspended, in case of war, on account of the inability of an alien enemy to sue. "By the policy of the law, alien enemies shall not be admitted to actions to recover effects which may be carried out of the kingdom to weaken ourselves and enrich the enemy." 1 Bacon Ab. Aliens, D. That reason of policy would not apply where suit is not by one of the enemy to collect his resources, but by the adhering citizen to put himself in means.

So far as the suspension of legal remedies is concerned, we understand the rule only denies to the citizens of each of the belligerents the right to bring suits in the courts of the country with which their own is at war; that the character of alien enemy carries with it simply a disability to *sue.*

In *McVeigh* v. *United States*, 11 Wallace, 259, it is said: "Whatever may be the extent of the disability of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued, and this carries with it the right to use all the means and appliances of defense." As further bearing upon this point see *Albrecht* v. *Tussan*, 2 Vesey & Beames, 323 ; *Barrick et al.* v. *Buba et al.* 32 Eng. L. & Eq. Rep. 465; *Dorsey* v. *Kyle*, 30 Md. 518 ; *Dorsey* v. *Dorsey*, ib. 524; *Griswold* v. *Waddington*, 15 Johns. 83; *Kemp's Lessee* v. *Kennedy*, 5 Cranch, 173 ; *Ludlow* v. *Ramsey*, 11 Wall. 581.

It is next insisted that though the foreclosure proceedings be not held void for want of jurisdiction in the court, yet the impossibility of the defendant receiving or obeying the published notice of the pendency of the suit, constitutes a ground for equitable interference and relief. Under the 15th section of our Chancery Practice Act, Davis had three years within which to appear in open court, and petition to be heard touching the matter of the decrees of foreclosure, and upon paying such costs as the court should deem reasonable, he would have been allowed to appear and answer the complainants' bills,

and thereupon such proceedings would have been had as if the defendant had appeared in due season, and no decree had been made. ·The decrees of foreclosure, then, were not absolute, but only provisional. They were rendered in the one case on the 20th of October, and in the other on the 21st of March, 1862, and did not become absolute until the 21st of March, and 20th of October, 1865. Up to these dates, Davis might have appeared in and defended the suits with the same effect as if he had appeared at the term of court designated in the published notice. Whatever restraint of war might have been upon him before, he was under none, further than his imprisonment, from the time he was in Havana in August or September, 1863. He was at that time free to come north, and pay the taxes on his lands, to pay his debts, and appear and defend the foreclosure suits. Because he chose rather to invest his money in articles contraband of war, and attempt to run them through the blockade to Mobile, for the succor and aid of those who were carrying on war against the government, that can not be admitted as an excuse in a court of justice. Neither can his subsequent imprisonment, which was by his own wrong incurred, and in his own wrong submitted to. President Lincoln's proclamation of amnesty was issued December 8th, 1863, offering pardon and amnesty to all persons who would take the oath of allegiance. At any time afterward Davis could have relieved himself from imprisonment by submitting to the authority of the United States. And his duty in that regard is stated by the Supreme Court of the United States in the case of *The William Bagaley*, 5 Wallace, 408, as follows: "The duty of á citizen, when war breaks out, if it be a foreign war, and he is abroad, is to return without delay; and if it be a civil war, and he is a resident in the rebellious section, he should leave it as soon as practicable, and adhere to the regular established government." If it be said he had no notice of the suits, he certainly, in the spring of 1864, received, by letter from Watson, actual notice of the suits having been instituted, and there was then

ample time for him to have appeared and had the decrees opened before they became absolute.

Another claim made, is, that Davis and his assignees are entitled to the benefit of the 15th section of the Chancery Act before referred to, which allowed them three years to come in, and, upon petition, open the decrees, and appear and answer the bills.

The bill of the appellees is not framed with any such object in view, nor have they proceeded conformably to the statute; but without stopping to consider whether this may be treated as a proceeding under that statute, we will assume it to be such.   It is then insisted that as the pendency of the war suspended the running of the statute of limitations, and as it was held in *Mixer* v. *Sibley,* to suspend the running of the limitation of the one year allowed for redemption from sales under execution, so here, this three years' limitation for coming in to open these decrees and answer, should be held to have been suspended until the termination of the war.   It is not denied, on the other side, that this three years' limitation should be held to be suspended during the time that Davis was prevented by the accident of war from having access to the court.   The controversy is, as to what shall be taken as the date of the expiration of the suspension and of the commencement of the running of the three years.   Appellees say it should be the time of the termination of the war in the State of Alabama, and that that was the 2d day of April, 1866, the date of the proclamation of the President declaring the war closed in several of the States, among which was Alabama; that it was decided in the case of *The Protector,* 12 Wallace, 700, in applying the principle of suspension to the five years' limitation within which appeals must be brought, that the war did not close as to that State until that day.

Taking that as the time from which the three years should commence running, these suits of the appellees having been commenced in December, 1868, were instituted within the three years allowed by statute for application to be made to

open the decrees of foreclosure. Appellants contend that the running of the limitation of the three years was suspended only during such time as Davis was actually prevented by the war from having access to the court, and that that time expired when Davis was in Havana, in August, 1863.

In *Mixer* v. *Sibley* the court say: "The fact of inaccessibility may be considered the true reason why this statute (of limitations) has been held to be suspended during a time of war;" and it was there held that the efflux of time as to redemption was suspended during the continuance of hostilities, and that hostilities did not cease until June 13th, 1865, the date of the President's proclamation to that effect.

That proclamation removed all restrictions upon ordinary pacific intercourse between the people of the different sections of the country east of the Mississippi river. In *Semmes, Admr.* v. *The City Fire Ins. Co.*, 6 Blatchf. 458, it was said: "By the common consent of all departments of the government, such intercourse (private civil affairs) was substantially free. and unrestrained after June 13th, 1865, as well as after April 2d, 1866;" and it was there held, that the right to bring suits on contracts made before the war was revived on the 13th of June, 1865. Davis was released from his imprisonment in June, 1865; he was engaged in the summer and fall of that year in building steamboats in Indiana. In September or October of that year he was in Chicago, the place of the holding of the court, looking after this property. It must be presumed he then ascertained, if he did not know before, that the mortgages had been foreclosed, and he was bound to know what were his rights and duties in regard to relief and redemption from the sales. At least from this time we must consider the suspension as having ceased, and the three years as having commenced to run; and three years from that time had expired before the appellees commenced these suits. From that time Davis was in a position where he could avail himself of the opportunity afforded by the statute to appear in the foreclosure suits, open the decrees, file his answers, and

redeem his lands.  He could then have as freely prosecuted a suit in any of the courts of this State, as could a citizen of this State.  The disability to sue which attaches to the character of alien enemy continues only while the party is abiding in his own country.  *Clark* v. *Morey,* 10 Johns. 71 ; *Bradwell* v. *Weeks,* 1 J. Ch. 208 ; *Hutchison* v. *Brock,* 11 Mass. 122 ; *Wells* v. *Williams,* 1 Lord Raym. 283.

But it is not essential that Davis should not have been under disability to sue, for the action of the defendant under the section of the statute in question, is a defensive proceeding, and for the purpose of prosecuting it the court was always open to Davis and those representing him.  *McVeigh* v. *United States, supra.*

But it is answered, no matter what might have been the actual situation of Davis, his legal status was that of an alien enemy until the close of the war, and he must be intended as having been denied the opportunity to appear and protect his interest in this property.  Regard is to be had to the nature of the application.  It is one made to a court of equity for relief against the consequences of not doing what, by the uncontrollable accident of war, the party was prevented from doing, and a case of actual hindrance must be shown, not a mere theoretical one arising out of the idea of the legal status of an alien enemy ; else, he fails to make out a " conscientious title to relief," which he must do. 1 Story Eq. Ju. § 79.

We fail to perceive that by reason of the accident of the war, Davis was prevented from paying his mortgage indebtedness, or from redeeming his lands, or from having his day in court to show cause against the foreclosure proceedings.

A point is made that there is a fatal defect in the foreclosure proceedings for the want of a sufficient affidavit of the nonresidence of the defendants, in that the affidavits are not entitled in the christian and surnames of all the complainants and of all the defendants, and that these may be regarded as bills of review, where advantage may be taken of such a defect. The affidavits were entitled in the one case, *Horatio Seymour*

302      SEYMOUR *et al.* v. BAILEY *et al.*     [Sept. T.

Opinion of the Court.

*et al.* v. *John W. Davis et al.* and in the other, *Horatio Seymour et al.* v. *John W. Davis.* Cases are to be found where affidavits of this description have been pronounced insufficient, but in *White* v. *Hess et al.* 8 Paige, 543, a like form of affidavit was held sufficient, with which we agree.

Another ground for equitable interference and relief which is urged is, that the institution of the foreclosure proceedings was a breach of good faith toward Davis, on account of an alleged extension of time of payment. Davis testifies that in January, 1858, when he paid to Mr. Coventry the first installment on the mortgage on land in section 12, he remarked that he might find it difficult to make the payments on the two mortgages in the future as they became due, and might want an extension ; and that Coventry replied that the funds which had before been paid by him were tied up by proceedings in court between the Price and Seymour estates, and that it would be better for them if the payments were not made, because if made, they would lose the interest. Laying aside the want of any authority in Coventry to affect the Seymours by such a statement, it is manifest that Davis did not rely upon that as any extension of payment, because he subsequently made applications to the Seymours themselves upon the subject. After this, Davis, in the winter of 1857–8, applies to Horatio Seymour for an extension, who refers him to his brother, John F., as attending to their land matters, saying that, so far as he was concerned, he was willing to give him longer time. We say the winter of 1857–8, though Davis states it as 1858–9; he is evidently mistaken in this, as appears from his letter of March 9th, 1858, referring to this interview, and from the stipulation in evidence of what Horatio Seymour would state as to the time, which was received as evidence. We next have the letter of Davis of March 9th, 1858, to John F. Seymour, wherein he speaks of having had some conversation with Mr. Coventry, and also with his brother at Washington, in reference to an extension of time on the payment due February 21st, of $2600, and asks for six

months' extension, stating that he might be prepared to pay it earlier, that he was anxious to pay it as early as possible.

He next has an interview with John F. Seymour on the subject, in the spring or summer of 1858, at which, he testifies, he made an application for. an extension of time to pay these mortgages; that Seymour said he was not disposed to press him in these payments, and had no objection to giving the extension, and that he then assented to it; that no definite time was agreed upon. This evidence of what transpired between Davis and Coventry and the Seymours, is all there is in the record, save, perhaps, the Price matter, which will be hereafter noticed, upon which to base the claim of expectation of extension, or any indulgence in payment. It is not claimed that there was any valid extension of payment which would have amounted to any defense against the foreclosure suits, but that there was an assent to an extension of payment on this mortgage indebtedness for an indefinite period of time, which amounted to an understanding that no proceeding to foreclose the mortgages should be taken without reasonable notice to Davis to make payments. We do not think that from what occurred there was any active duty imposed upon the Seymours to give notice before commencing foreclosure proceedings, but that there was an assent to the extension of payment for a reasonable length of time, before the expiration of which suit should not have been commenced; and what that reasonable time was, is to be determined in view of all the circumstances of the case.

As bearing upon this, it is to be noted that the time asked for in Davis' letter is only six months, with an intimation of being prepared to pay earlier; and it is only in reference to the payment which had become due February 21st, 1858, of $2600 on the mortgage on land in section 6; and according to the letter, it was only as to this particular payment that the previous applications for extension to Coventry and Horatio Seymour were made. This affords reason to think that the subsequent conversation with John F. Seymour might

304      SEYMOUR *et al. v.* BAILEY *et al.*      [Sept. T.

Opinion of the Court.

have been in regard to the extension of this particular payment only. The 20th of November, 1860, comes around. In the meantime nothing has been paid; two yearly installments on each mortgage had become due, and besides, the installment of February 21st, 1858, remained unpaid. On said 20th of November, Davis writes a letter to Coventry. It purports to be in answer to a previous letter from the latter. Davis says, from one expression in his answer Coventry's letter may have referred to the payments on these mortgages.

Even had there been a duty resting upon the Seymours, as is supposed, to apply to Davis for payment before foreclosing, it might reasonably be presumed that this letter of Coventry was a discharge of that duty.

In this letter of his to Coventry, Davis says he had intended offering to resume payments, making them every ninety days from $1000 to $1500, but the result of the election, he fears, will prevent. Not that his straitened circumstances would prevent, or any extension of time, or the Price suit. And he says, if a majority go for secession, he will go with them.

This letter reasonably gave the Seymours to understand, that in case of the secession of the State of Alabama, Davis would make no further payments on his mortgages. It seems idle to say that after this time the reason why Davis did not make payments on the mortgages was, that he was led into the neglect to do so by any promise of extension of payment.

There was the same neglect of Davis to pay the taxes on the lands as there was to pay the mortgages. He paid none after those for the year 1859, and the lands were sold in 1861 for the taxes of 1860. He does state that he wrote twice, through the blockade, to Mr. Huntington, at New Orleans, to send money to Mr. Watson, at Chicago, to pay the taxes, but that he received no reply to either of the letters.

If he had any concern for the property, why did he not attend to the payment of the taxes on it when he was in Havana, in August, 1863, with ample means?

The omission to pay the taxes, surely, was not caused by anything said to him by John F. Seymour at the interview with him. Instead of availing himself of this opportunity when at Havana to pay the taxes and the mortgage debts, he endeavors to return, with his means, to the blockaded port of Mobile, where he would be in a situation of physical inability to make the payments, and he is captured in the act of so doing.

There was a wilful default in the payment of taxes; and it affords ground of inference that the default in making the mortgage payments was of the same character. It is confirmatory of the evidence afforded by the letter of November 20th, 1860, of a deliberate decision not to pay anything more on the property, in case Alabama should take the step which she did. The terms of the mortgages rendering the premises liable to be sold, in case of default, on giving thirty days notice in a newspaper, called for especial vigilance on Davis' part as to delinquent payments. In commencing the foreclosure suits in December, 1861, nearly three years and a half after the interview with John F. Seymour, we see no just cause of complaint, in view of the intervening defaults, and of what had transpired, either that the mortgagees had not waited upon Davis for a reasonable time, or that the proceeding was in violation of any understanding had at that interview, or a disappointment of any reasonable expectations which could have been excited on the part of Davis by the conduct of the Seymours.

The pendency of the Price suit in the United States Court is insisted on as ground for reliance upon an implied extension of time of payment to Davis until its termination, and also as a defense to the foreclosure suits, and as divesting the State court of all jurisdiction in the premises, for the alleged reason that the mortgage debt and premises were in the exclusive jurisdiction and custody of the United States Circuit Court.

20—66TH ILL

That case was this: Jeremiah Price and Henry Seymour (the father of the Seymours, parties to this record), in 1835, entered into a contract, whereby Western lands were to be selected and purchased by Price, in the name of Seymour, with money furnished by the latter, amounting to $5000. They were to be sold within five years, and, after deducting from the proceeds the outlay, with interest and taxes, there was to be paid over to Price one-half of the residue. Two thousand two hundred and forty acres of land in Illinois were purchased under the contract, of which the mortgaged premises in question were a part.

July 6, 1857, John High, as administrator of the estate of Price, filed a bill against the heirs and devisees of Henry Seymour, setting forth that, since the death of Price, he had acted as the agent of the Seymours, in regard to the lands; that he had in his hands $18,488, proceeds arising from sales of the lands, subject to be paid as the court should order; that, as administrator of Price, he was entitled to one-half of the clear proceeds of the sales; that the defendants refused to admit and allow the right of the Price estate to said half of the proceeds. The bill prayed for an accounting, that High, as such administrator, might be declared entitled to retain one-half of the clear proceeds of all sales made or to be made; that the unsold portions of the lands might be sold under the direction of the court, and prayed for an injunction forbidding the making of any further sales of the lands, or the withdrawing from the complainant any further moneys derived from sales. No injunction was ever issued or receiver appointed. The cause was removed into the United States Circuit Court, and a final decree was not entered until May, 1869. December 7, 1859, a stipulation was entered into that $10,347.69 of the money in the hands of High, the administrator, should be placed in the hands of the attorney of the defendants, to be deposited and remain drawing interest, and abide the decision of the court; the stipulation declaring that the money had hitherto been retained and kept back as a

substitute for, and equivalent in security to an injunction for the complainant, instead of an injunction prayed for in the bill, and that it should so remain for the same purpose.

We are at a loss to conceive how it can be regarded, that by force of this suit in the United States Court, the mortgage debt and premises came to be within the exclusive jurisdiction and custody of that court. That suit was, to have the alleged trust declared, to have an order for the distribution of the moneys in the administrator's hands, and for an accounting. There being no injunction or receiver, it is not perceived wherein it was in conflict with the object of that suit, that the trustees, the Seymours, should go on in the exercise of their office as trustees, and make collections of the moneys due, either by suit or otherwise, and they would be subject to be accounted for by them in that suit.

It is claimed, that during the pendency of that suit, Davis could not safely pay the mortgage debts to the Seymours, and that purchasers at a foreclosure sale could not safely buy the property; and that therein it was injurious to the interests of the mortgagor to have a foreclosure made while that suit was pending, as competition at a foreclosure sale would be destroyed or lessened by reason of its not being safe for purchasers to buy at such sale, on account of the pendency of the Price suit. We apprehend, that whatever might be the result of an accounting in the Price suit, neither purchasers of the mortgaged premises, under a decree of foreclosure, could be disturbed in their titles, nor could Davis be called upon for repayment of any moneys he might have paid to the Seymours. The $10,347.69 was accepted and taken in lieu of an injunction, and as a sufficient security against any loss which might be sustained in consequence of the collection of outstanding moneys by the trustees, and it should be regarded as a virtual assent to the making of such collections. That suit would not affect the title to the lands which Davis had bought of the Seymours. They were purchased prior to the commencement of the suit.

There seems no ground to say that the pendency of the Price suit influenced Davis in not making his payments. Not a word was exchanged between the parties on the subject of that suit, save, that in January, 1858, Coventry made the un-authorized remark, so far as appears, that the former moneys paid by Davis were tied up by that suit, and that it would be better for the Seymours if the payments were not made, on account of the interest; and may be Watson made a re-mark about the suit when Davis saw him when he was in Chicago, in the fall of 1865. Davis, after what Coventry told him, made a subsequent payment in December, 1858, of the last installment on the purchase of another piece of land in section 36, for $9000, which shows that the pendency of the Price suit did not stand in his way. His delinquency in payments, we think, was due to causes quite other than that, as before endeavored to be shown.

Our conclusion is, that the consequences which are the subject of the bill of complaint, and against which relief is asked, did not result from inability to obviate them by reason of any event over which Davis had no power of control; that they are not imputable to any violation of good faith on the part of the mortgagees; but that they are due to Davis' own deliberate neglect and inattention; and that on the settled principles which govern in the administration of equitable relief, no equitable ground of complaint is shown, and that the bill should have been dismissed.

The decree must be reversed and the cause remanded for further proceedings consistent with this opinion.

*Decree reversed.**

---

*SEYMOUR *et al.* v. DAVIS *et al.*

Per CURIAM: For the reasons set forth in the opinion in the preceding case of *Horatio Seymour et al.* v. *John F. Bailey et al.* the decree in this case is reversed and the cause remanded.

*Decree reversed.*