*419
 
 Allen, J.
 

 The controlling question in this case arises out of the application of the facts of the record to Section 1465-72a, General Code, which reads as follows:
 

 “In all cases of injury or death, claims for compensation shall be forever barred, unless, within two years after the injury or death, application shall have been made to the industrial commission of Ohio or to the employer in the event such employer has elected to pay compensation direct.”
 

 It is conceded that Mrs. Rotar’s application for compensation is barred under this section unless she can avail herself of the fact that at the time that Rotar was killed she was residing in Austria-Hungary, and the United States and the Austro-Hungarian Monarchy were then in a state of war. During the period subsequent to her marriage to Rotar, up to and during the time covered by the record of the trial herein, Mrs. Rotar has been a resident of the village of Straza, district of Banat. Banat, up to the time of the dissolution of the Austro-Hungarian Monarchy, was a district of Hungary. Upon July 28, 1919, when Rotar was killed, the United States and the dual monarchy were at war. After the Armistice, the Austro-Hungarian Monarchy was dissolved and new governments came into existence. This controversy arises by reason of the fact that the district of Banat and the village of Straza eventually became a part of Jugoslavia, one of the new countries which arose upon the dissolution of the Austro-Hungarian Monarchy. -
 

 The trial court directed a verdict in favor of the defendant upon the ground that the claim was filed more than two years after the death of the decedent,
 
 *420
 
 by a citizen of a country never at war with the United States, namely Jugoslavia, and hence was barred under Section 1465-72a, General Code. However, Mrs. Rotar filed her application within two years after the war between the United States and Austria-Hungary was terminated. It is upon this ground, and upon the further ground that she was until the termination of the war a national of Hungary, that the Court of Appeals reversed the judgment of the trial court.
 

 It is elementary that, when a state of war exists, an alien enemy cannot prosecute any claim in the courts of a country at war with his country. Irrespective of statute, this is the universally accepted rule.
 
 Hanger
 
 v.
 
 Abbott,
 
 73 U. S. (6 Wall.), 532, 18 L. Ed., 939;
 
 Colorado Fuel & Iron Co.
 
 v.
 
 Industrial Commission,
 
 73 Colo., 579, 216 P., 706. The right of action is merely suspended until the close of the war, at which time it may be asserted by an alien enemy. Ann. Cas., 1917C, 213.
 

 However, the Industrial Commission claims that the Trading with the Enemy Act, which was passed by Congress on October 6, 1917, excludes Mr. Rotar. Section 2 of the act, 40 Stats, at L., 411, reads as follows:
 

 “The word ‘enemy,’ as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—
 

 “ (a) Any individual, partnership, or other body of individuals of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such ter
 
 *421
 
 ritory, and any corporation incorporated within snch territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory * *
 

 The Industrial Commission contends that in order to come within the purview of this act, a citizen of an enemy country must reside within a country at war with the United States. It is claimed that a citizen of Austria-Hungary residing in Spain during the World War would not have been an enemy of the United States within the meaning of the Alien Enemy Act. However, the definition of “enemy” in this federal statute is expressly limited to apply “for the purposes of such trading [trading with the enemy] and of this Act.” The definition of the words “to trade,” found in the clause of Section 2 of the act, cannot by any construction be extended to apply to an effort to enforce rights under the Workmen’s Compensation Law of Ohio (Section 1465-37
 
 et seq.,
 
 General Code). Moreover, the act itself specifically provides that nothing in the act “shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war.” Section 7 (b), 40 Stats, at L., 417. We therefore overrule this contention.
 

 A more serious objection to this proposition is that it is premised upon the assumed fact that Mrs. Botar became a citizen of Jugoslavia during the war, and hence did not reside in an enemy country when Botar was killed. She did not become such citizen by virtue of change of residence, for the record shows that during all periods in question she
 
 *422
 
 was a resident of the district of Banat in Hungary, and never changed her residence. The case is thus sharply distinguished from that of
 
 Seymour
 
 v.
 
 Bailey,
 
 66 Ill., 288. Counsel for the commission claim, however, that Mrs. Rotar’s citizenship was changed for her without her consent, by the secession of certain parts of Austro-Hungarian territory from that government during the war. This claim is not borne out by the facts. That certain portions of Austria-Hungary did wish to secede, and that there was for decades a well-defined movement in those regions to secede from Austria-Hungary, is a historical fact, of which this court will take judicial notice.
 
 Inland Steel Co.
 
 v.
 
 Jelenovic,
 
 84 Ind. App., 373, 150 N. E., 391. However, the treaties which were signed at the end of the war left the district of Banat under the jurisdiction of Austria-Hungary. Thus Section 6 of Part I of the Treaty of Armistice with Austria-Hungary (Scott’s Official Statement of War Aims and Peace Proposals, 1916-1918, 446, 448), left the administration of the evacuated territory of Austria-Hungary, of which the district of Banat was a part, to the “local authorities under the control of the allied and associated armies of occupation.” The Military Convention, regulating the condition under which the Armistice was to be applied in Hungary (Scott’s Official Statement of War Aims and Peace Proposals, 1916-1918, 488, 489), provided that “civil administration will remain in the hands of the Government.” And in Article 17 of the same Military Convention it was provided that “the Allies shall not interfere with the internal administration of affairs in Hungary.”
 

 The signing of the Armistice suspended military
 
 *423
 
 operations, but did not terminate the war.
 
 Southwestern Telegraph & Telephone Co.
 
 v.
 
 City of Houston,
 
 (D. C.), 256 F., 690;
 
 Commercial Cable Co.
 
 v.
 
 Burleson,
 
 (D. C.), 255 F., 99;
 
 Kahn
 
 v.
 
 Anderson, Warden,
 
 255 U. S., 1, 41 S. Ct., 224, 65 L. Ed., 469.
 

 The proclamation of February 7,1919, by the Secretary of State of the United States as to the sympathy of the government of the United States with the nationalistic aspirations of the Jugoslav race could not, as urged by the commission, alter this conclusion. While in this statement it was said that the government of the United States “welcomes the union,” speaking of the union of all branches of the Slav race, it expressly recognized that “the final settlement of territorial frontiers must be left to the Peace Conference for adjudication according to the desires of the people concerned.”
 

 Even if this statement had not recognized the fact that the proclamation of the Secretary of State did not embody any final settlement of territorial boundaries, it could not have made the district of Banat a part of the Jugoslav union. Nor could it by so doing have terminated the state of war between the district of Banat, as a part’ of Hungary, and the United States. Recognizing the kingdom of the Serbs, the Croats and Slovenes could not terminate the war existing between other distinct powers, nor change the alien enemy status of dependents living within Austria-Hungary. Nor-could any executive proclamation in and of itself, without authority of Congress, terminate the state of war. The Constitution of the United States expressly confides to the national Congress the declaration of war and the making of peace.
 

 Congress alone has the power to declare war, and
 
 *424
 
 the President of the United States has no power to declare war or conclude peace except as empowered by Congress.
 
 Perkins
 
 v.
 
 Rogers,
 
 35 Ind., 124, 9 Am. Rep., 639.
 

 As to the exact time when the war was ended, there is some confusion in the decisions. It is held in
 
 First National Bank of Pittsburgh
 
 v.
 
 AngloOesterreichische Bank,
 
 (C. C. A.), 37 F. (2d), 564, that, as regards the statute of limitations, the joint resolution of Congress of July 2, 1921 (42 Stats, at L., 105), did not terminate war with Austria, since such resolution was not legally binding upon Austria, and the restoration of peace can be accomplished only by bilateral treaty. This is in spite of the fact that the proclamation of the Peace Treaty by the President stated that peace was proclaimed as of July 2, 1921. However, the fact that the war with Austria-Hungary was ended by joint resolution of Congress upon July 2, 1921, is recognized by the Supreme Court of the United States, and by other federal courts, in
 
 Swiss Nat. Ins. Co., Ltd.,
 
 v.
 
 Miller, Alien Property Custodian,
 
 267 U. S., 42, 45 S. Ct., 213, 69 L. Ed., 504;
 
 Miller, Alien Property Custodian,
 
 v.
 
 Camp,
 
 (D. C.), 280 F., 520;
 
 In re Miller, Alien Property Custodian,
 
 (C. C. A.), 281 F., 764;
 
 Zimmerman
 
 v.
 
 Hicks, Alien Property Custodian,
 
 (C. C. A.), 7 F. (2d), 443.
 

 Mrs. Rotar made her application within two years from this date; hence her petition was filed in time, and her claim was not barred under the statute.
 

 Judgment of the Court of Appeals affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Jones, Matthias, Day and Robinson, JJ„ concur.