Fritz Schultz, Jr., Co., Inc., Plaintiff, *v.* Raimes & Co.
Defendant (Actions 1, 2, 3, 4 and 5).

(City Court of the City of New York, Special Term, April, 1917.)

Treaties — construction of — when courts will take judicial notice that
a state of war exists between United States and Germany —
actions — when subject of Germany may sue in our courts —
contracts.

Corporations — when corporation controlled by German citizens is
entitled to sue on debts contracted in time of peace — who are
not alien enemies — treaties — injunctions — motions and orders.

The courts will take judicial notice that on April 6, 1917,
by proclamation of the President, a state of war was formally
declared to exist between the United States and the Imperial
German Government.

Under the treaty of 1799 between the kingdom of Prussia
and the United States, which was affirmed by the treaty of 1828,
and which provides that if war should arise between the two

contracting parties the merchants of either country then residing in the other shall be allowed to remain nine months to collect their debts, settle their affairs and depart freely, a subject of Germany may sue in our courts provided he is a resident here and entitled to the protection extended by the President's proclamation.

A New Jersey corporation is a distinct entity and notwithstanding its practical control and ownership by a German corporation or by German citizens in control thereof is a citizen of the state of New Jersey and is entitled to the privileges and immunities of all citizens of the United States.

The said corporation did not upon the declaration of war between the two countries become an alien enemy and is entitled to sue on debts contracted in time of peace.

A motion to restrain *pendente bello* the prosecution of an action for debt brought by said corporation upon the ground that it was an alien enemy and, therefore, is *persona non standi in judicio* denied, with costs.

Motion to restrain prosecution of five actions on the ground that plaintiff is an alien enemy.

Gerard Roberts, for motion.

Maxwell C. Katz, opposed.

McAvoy, J. By the proclamation of the President on April 6, 1917, it was announced that a state of war between the United States and the Imperial German Government, which has been thrust upon the United States, is hereby formally declared, and all officers, civil and military, of the United States are specially directed to give undivided and willing support to those measures which may be adopted by the constitutional authorities in prosecuting the war to a successful issue and obtaining and securing a just peace. Therein is prescribed the conduct to be observed on the part of the people of the United States toward all natives, citizens, denizens or subjects of Germany who, under the law are alien enemies, and likewise are set forth

the injunctions to all alien enemies with respect to their duties toward the United States and to the people thereof and to the people of the state and territories thereof.

The claim of the right to confiscate debts or restrain or suspend the prosecution of the remedies for the collection of debts contracted by individuals in time of peace and which remain due to subjects of the enemy at the declaration of war rests upon the broad principle that war gives to the sovereign or state full right to take the persons and confiscate the property of the enemy wherever found, and that while modern policy is more humane and wise in respect to mitigation of this rigid rule than was that of the ancients, yet this can only affect the exercise of the right and does not impair the right itself. In former times the right to confiscate debts was admitted as a doctrine of public law of the nations, and Grotius, Pufendorf and Bynkershoek pronounced in favor if it. Bynkershoek in his *Quaestiones Juris Publici,* says (Ponceau's Translation): "Actions and credits are by the law of nations not less under our dominion than other goods; why, therefore, might we pursue these and not those by the law of war?" And Pufendorf, in his *De Jure Naturae et Gentium,* speaks for the same power (Lib. 8, ch. 6, § 23). See also *De Jure Belli et Pacis,* Grotius (B [1], C. [1], § 6). Cicero states in his *De Officiis* that promises are not to be kept where the creditor becomes the enemy of the country of the debtor. Publicists and jurists of Europe generally hold favorably to this right except Vattel in his Law of Nations, who holds that at present (1758) a regard to the advantage and safety of commerce has induced all the sovereigns of Europe to act with less rigor in this point. For, he says, strangers trusted subjects of the foreign sovereign only from a firm persuasion that the custom generally

received would be observed.   Notwithstanding the weight of modern authority against the claim of right on the part of the sovereign or state to confiscate debts or funds of his enemy during the war the judicial trend of authority in this country is decidedly in support of the right.   Mr. Justice Story, in the Supreme Court of the United States, laid down the right to confiscate debts and enemy property found in the country according to the rigorous doctrine of the elder jurists (*Brown* v. *United States,* 8 Cranch, 110) and he said that the opinion was fully confirmed by the judgment of the Supreme Court in *Ware* v. *Hylton,* 3 Dall. 199, where the doctrine was emphatically asseverated by some of the judges, reluctantly admitted by others and denied by none.   See 1 Kent Comm. 65.   It may therefore be maintained as a doctrine of public law of this country that it is purely a discretionary matter with the legislature of the Union whether or not to confiscate debts and prohibit suits therefor when contracted by our citizens and due to the enemy by a special enactment for that purpose, or it may consider such action as a naked and impolitic right condemned by the enlightened conscience and judgment of modern times, and therefore fail to assert it.   It does not appear dogmatic doctrine in our country's laws of war that a declaration of the existence of such a condition of belligerency is alone sufficient *ex proprio vigore* to render void all obligations between our citizens and subjects of the alien enemy, or to suspend remedies for the enforcement of debts and dues.   In the war with Great Britain in 1812 the question arose whether or not the declaration of war gave the right to seize enemy's property found on land at the commencement of hostilities and condemn the same as prize of war, in the absence of any legislative act which authorized such seizure and condemnation, and Chief Justice Marshall said that it

was the universal practice, based upon the structure of our government, to forbear to seize and confiscate debts and credits which have been acquired in peace in the course of trade. *Brown* v. *United States, supra.* Bynkershoek, who maintains the broad principle in war that everything done against the enemy is lawful; that he may be destroyed, though unarmed and defenseless; that fraud or even poison may be employed against him; that the most unlimited right is acquired to his person and property, admits that war does not transfer to the sovereign a debt due to his enemy because, he says, the occupation which is had by war consists more in fact than in law. Let it not, however, be supposed that it is only true of actions that they are not condemned *ipso jure,* for other things also belonging to the enemy may be concealed and escape condemnation. Vattel, in his Law of Nations, observes that the sovereign can neither detain the person nor the property of those subjects of the enemy who are in his dominions at the time of the declaration.

Chitty, in his work on International Law, after stating generally the right of seizure, says: " In strict justice that right can take effect only on those possessions of a belligerent which have come into the hands of his adversary after the declaration of hostilities." It thus appears from authoritative opinions of publicists who have written modernly on the *jus belli* that war gives the right to confiscate, but does not itself confiscate property or debts of the enemy. Therefore, in the disposition of an application to expound the effect of the declaration of war lately had between the United States and the Imperial German Government a rule ought not lightly to be admitted which would give to a declaration of war an effect in this country it does not possess elsewhere, which would be opposed to the most learned and respected opinion of modern jurists

and publicists everywhere.  There being no act of Congress as yet passed which bears upon this subject, nor a proclamation of the President under the authority conferred upon him by the resolution of Congress declaring a state of war to exist which confiscates enemy property within the United States upon a declaration of war, it seems to me entirely free from doubt that even an alien enemy may still sue in our courts provided he is a resident here and entitled to the protection which the President's proclamation extends to him.  The proclamation of the President indeed contains words which, in their import, are susceptible of a construction adverse to a ruling in favor of the applicant.  He says: ''All alien enemies are enjoined to preserve the peace toward the United States and to refrain from crime against the public safety and from violating the laws of the United States and of the states and territories thereof, and to refrain from actual hostility or giving information, aid or comfort to the enemies of the United States, and to comply strictly with the regulations which are hereby, or which may be from time to time, promulgated by the President, and so long as they shall conduct themselves in accordance with law they shall be undisturbed in the peaceful pursuit of their lives and occupations and be accorded the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States, and toward such alien enemies as conduct themselves in accordance with law all citizens of the United States are enjoined to preserve the peace and to treat them with all such friendliness as may be compatible with loyalty and allegiance to the United States.''

The conclusion or inference to be drawn seems irre-

sistible. And of this proclamation judicial notice must be taken.

Moreover, if these views of the present status of public law in respect of the property and credits of alien enemies be not grounded upon true principle, there had been negotiated and adopted, as early as 1799, a treaty between the Kingdom of Prussia and the United States, which was affirmed by the treaty of 1828, article XXIII of which reads as follows: "If war should arise between the two contracting parties, the merchants of either country then residing in the other, shall be allowed to remain nine months to collect their debts and settle their affairs, and may depart freely, carrying off all their effects, without molestation or hindrance, * * *." And article XXIV reads as follows: " * * * And it is declared, that neither the pretence, that war dissolves all treaties, nor any other whatever, shall be considered as annulling or suspending this and the next preceding article; but on the contrary that the state of war is precisely that for which they are provided, and during which they are to be sacredly observed as the most acknowledged articles in the law of nature and nations."

This court must take judicial notice of the public acts of the United States and its several departments, and, therefore, until this treaty is denounced as non-operative it would seem to confer upon alien enemies of German nationality, notwithstanding the existence of a state of war, the right to collect their debts by whatever process or remedy the United States or its several states and territories afford, pursuant to the provisions of our Federal Constitution that the treaties of the United States with foreign powers shall be the law of the land, anything in the Constitution or laws of the several states to the contrary notwithstanding.

That war dissolves all treaties between the contract-

ing parties is a principle enunciated by many of the legal writers upon public law, but as express promises and engagements of nations should be inviolable, and the duty of the nation is to take care that she be not engaged in anything contrary to the duties which she owes to herself and others, and as nations may in their treaties insert such clauses and conditions as they think proper to make them perpetual or temporary or dependent upon certain events, it is competent to agree to abandon this principle of the law of nations and to contract with a view to obviate its effect. Although the treaty may become very oppressive to one of the contracting parties, it is not thereby revoked. Its revocation or denouncement requires a public act of which the judicial courts, executives and legislative assemblies must take notice. Vattel's Law of Nations, book 2, chap. 2, p. 145.

It may be determined that notwithstanding the seeming cogency of the arguments for the right of the resident subject of the alien enemy to proceed in our courts either according to the principles of the public law of nations or pursuant to rights grounded upon the capitulations of the treaty heretofore mentioned between the Kingdom of Prussia and the United States that all trade and intercourse and rights of alien suitors have been suspended *ex necessitate.* If such be the rule, any interdiction against the prosecution of suits for the collection of debts by an alien enemy does not affect the plaintiff here, since, notwithstanding its practical control and ownership by the German corporation or the German citizens in control thereof, the law of this state, I maintain, holds the corporate body as a distinct entity from the alien owners of its stock, and consequently, though of foreign ownership, it is a citizen of the state of New Jersey and entitled to the privileges and immunities of all citizens of the United

States. This argument seems sound according to the legal logic of our corporate law and its development. Obviously such claims are open to the use of the cloak of subterfuge against the enforcement of acts or proclamations designed to prevent the giving of aid or comfort to the enemy by means of moneys or things of value. But, if so, the proclamation containing the interdiction of nonintercourse between our citizens and those of the alien enemy must be strictly worded to accomplish the prevention of such an usage.

It is claimed by the plaintiff that this company is an American company for all intents and purposes in peace and war. The defendant admits that it is an American company in time of peace, but says that in time of war they are not to be barred by technicalities from showing its German constitution. This proposition is devoid of authority. The status of the plaintiff company remains unaffected by a state of war. In no recognized authority on international law or in the writings of any jurisconsults or publicists who have adverted to the subject is there any suggestion to the effect of the defendant's contention that a company is not an entity entirely apart from the nationality of its shareholders. In England, from which we derive many of our concepts of public law in relation to the conduct of war, it is held that the position of a company composed of foreign stockholders is not altered in time of war. *Amorduct Co.* v. *Defries,* 31 Times L. R. 69; 1914. Phillimore, in his treatise on International Law, volume 3, discusses the case of *Society for Propagation of the Gospel* v. *Wheeler,* 22 Fed. Cas. 758; 2 Gall. 105, and holds, with our courts, that in their corporate capacity members of the corporation have no such political relations as to denominate them *corporaliter* a subject or an alien enemy, and further, that the plea of alien enemy cannot apply to a corporation aggre-

gate at all. '' If it could,'' he says, '' it would follow that a single stockholder of one of our banks residing in an enemy's country would disable the corporation to sustain any action in our courts.'' The same doctrine is laid down in Bacon's Abridgment and applied to an alien enemy. ''And an alien enemy, for the same reason, viz, because he acts *en autre droit,* may sue as executor or administrator.'' 1 Bac. Abr. ''Alien '' D; ''Abatement,'' B 3; 1 Salk. 46 pls. 1, 2; 1 Strange, 282; *Caroon's Case,* Cro. Car. 8; *Wyngate* v. *Mark,* Cro. Eliz. 275. Yet it might be a good plea, that the testator or intestate, at his decease, was an alien enemy. Skin. 370.

In *Society for the Propagation of the Gospel* v. *Wheeler,* 22 Fed. Cas. 758; 2 Gall. 105; Case No. 13,156 Mr. Justice Story says: '' The defense of an alien enemy is by no means favored in the law (see Steph. Pl., Ed. 1824, p. 67), and some modern cases have gone a great way in discountenancing it, further, indeed, than seems consistent with the general rules of pleading. * * * In *Oppenheimer* v. *Levy* (2 Strange, 1082), to an action of assumpsit the defendant pleaded alien nee, without saying alien enemy, and the court held that, as an alien friend may maintain a personal action, and in order to abate the writ, the plaintiff should be shown to be an alien enemy, which is not to be presumed, nor the contrary necessary to be replied, therefore the plea was bad; and so the law had before that time been held (Dyer, 2). * * * In general an aggregate corporation is not in law deemed to have any commorancy, although the corporators have.''

In England this matter has been lately decided by the learned Chief Justice Baron Reading, in actions brought for the purpose of determining whether during the war payment of a debt can be enforced by a company of which all the directors and shareholders

are alien enemies. *Continental Tyre & Rubber Co., Lim.,* v. *Daimler Co., Lim.,* 1915, 1 K. B. 893. The company was incorporated in England under the " companies " acts to trade in motor car tires made in Germany by a company incorporated under German law. The German company formed a number of subsidiary companies in various parts of the world for the sale of these tires. The plaintiff company was formed for the purpose of selling such tires in the United Kingdom. All the shares except one of the English company (the plaintiff) were held by subjects of the German Empire residing in Germany. The directors were all subjects of the German Empire and resident in Germany. The business was managed by three residents of England. The defendants contended that the plaintiff company must be regarded as an alien enemy notwithstanding that it was a corporate body, and that as commercial intercourse between persons under the protection of the Crown and persons who are alien enemies is illegal, payment to the plaintiff must be illegal. It was also urged that the court must look at the substance and not the technicalities of the matter. Under the Trading with the Enemy Act, issued on September 9, 1914, payment to the plaintiff company would be illegal if the company were to be regarded as an alien enemy. The ruling there made squarely holds that a company or corporation is an entity created by virtue of statutory enactment. It was an English company before the war. By the outbreak of the war an English company does not cease to be an English company. " It remains an English company, regardless of the residence of its shareholders or directors, either before or after the declaration of war. * * * If the creation of the company could be treated as a mere technicality there would be considerable force in this argument," *e. g.,* that the entity should be swept aside and treated, not

as an English, but as a German, company, and therefore as an alien enemy.

There, as here, it is undoubtedly the policy of the law to regard substance and to disregard form, to prevent the hindrance and hampering of justice by mere technicality, but it is equally true in this state, as in the United Kingdom, that substance must not be treated as form or swept aside as technicality because that course might appear convenient in a particular case. It is an obvious fallacy that an entity created by statute is or can be regarded during the war as a mere form or character because of the enemy character of its directors. Corporations, organized under our law, have a real existence with separate rights and liabilities as legal entities. They differ in person and in substance from the subscribers, shareholders and directors. This corporate body, organized in New Jersey and operating, pursuant to the protection of its laws and entitled to all the franchises and rights involved in its corporate existence, cannot be technically an American company and substantially a German company, except by the use of inaccurate and misleading language. It is not a mere name or mark or cloak or device to conceal the identity of persons, and it is not suggested that the company was formed for any dishonest or fraudulent purpose. It is a legal body clothed with the form prescribed by our legislature.

The consideration applicable to the decision in that case and the facts and circumstances of the alienation of the shareholders and directors are similar to the incidents of persons in this case, and the facts here are more favorable to the corporate body suing as a plaintiff. I find the high authority thus expounded by the Chief Justice of England, while not binding upon courts in this country, entitled to the highest respect and follow it unreservedly. While this judgment of

the Court of Appeal was reversed in the House of Lords and Privy Council in June, 1916 (2 App. Cases, 1916, p. 307), yet as the earlier opinion is in entire harmony with our law as laid down in *Society for the Propagation of the Gospel* v. *Wheeler, supra,* I believe that the trial court should adhere to that which conforms to our own judicial holdings.

Finally, the court is invited to stay these causes upon the alleged ground of public policy that moneys derived from the prosecution of the suits would be used in giving aid and comfort to the enemy by transferring the fruits of the corporate recovery to the individuals resident in Germany, who are alien enemies. But courts are not empowered to declare grounds of public policy nor to allow considerations thereof to be grounds of judicial decision. It is the province of the statesman to discuss and of the legislature to determine what is best for the public good and to provide for it by proper enactment. It is not within judicial cognizance to speculate what is best or for the advantage of the community. Judicial power has not extended to the right to establish as law everything which it considers for the public good and to prohibit everything which it believes otherwise. See opinion of Lord Halsbury, in *Jansen's Case,* A. C. 496.

The motion to restrain the prosecution of these five actions *pendente bello* upon the ground that the plaintiff is an alien enemy, and therefore is *persona non standi in judicio,* is denied, with costs.

Motion denied, with costs.