MARGARETE ARNDT-OBER, Plaintiff, *v.* METROPOLITAN OPERA CO., Defendant.

(Supreme Court, New York Special Term, January, 1918.)

Contracts — right to enforce — breach of — alien enemy — actions — courts — when motion to dismiss complaint denied.

> Subjects of an enemy nation, resident in this country, are entitled to invoke the process of our courts so long as they are guilty of no act inconsistent with the temporary allegiance they owe to this government.
>
> Although the proclamation of the president, April 6, 1917, is an administrative measure it has the force of a statute, and a subject of the Kingdom of Prussia by reason of treaty obligations has an absolute right to pursue her occupation as an opera singer and to claim the same consideration as that accorded to American citizens.
>
> Her right to contract as a singer carries with it the right to enforce her contract and a motion to dismiss the complaint in an action brought by her to recover for a breach of contract to sing will be denied.

MOTION to dismiss complaint.

Benno Loewy, for plaintiff.

Wise & Seligsberg, for defendant.

GAVEGAN, J.   Plaintiff sues alleging breach of contract and defendant moves for an order dismissing the complaint on the ground that plaintiff is an alien enemy, or staying proceedings until the end of the war.   Defendant argues, among other things, that plaintiff as an opera singer is a trader and an alien enemy; that she has procured no license, and therefore she is prohibited from doing business here or suing the person or corporation with which she trades for breach of contract.   Plaintiff argues, among other things, that plaintiff is not an enemy alien; that she is an employee and not a trader; that an employee does not need a license either to carry a hod or to sing in opera, and that plaintiff is protected in her enterprises by the treaties existing between the United States and the Kingdom of Prussia. For the purpose of this motion I do not deem it necessary to follow the able and exhaustive arguments submitted, nor to decide whether plaintiff is an " alien enemy," nor whether the Prussian treaties, as defendant insists, have been reduced to scraps of paper.   Subdivision C of the second section of the " Trading With the Enemy Act" provides that a citizen of Prussia like plaintiff may be declared an "enemy" by proclamation of the president.   In his proclamation of April 6, 1917, the president declared that all German male subjects over fourteen years of age resident here, which obviously does not include this plaintiff, are "alien enemies."   But he also declared that, "so long as they shall conduct themselves in accordance with the law, they shall be undisturbed in the peaceful

21

Supreme Court, January, 1918. [Vol. 102.

pursuit of their lives and occupations, and be accorded the consideration due to all peaceful and law-abiding persons.'' The necessary conclusion from that declaration which, although an administrative measure, has the force of statutory law, is that plaintiff has an absolute right to pursue her occupation as an opera singer and to claim the same consideration as that accorded to America's most favored sons and daughters. That is the main proposition, and the corollary is that the right to contract as a singer carries with it as an incident the right to enforce her contracts or to recover damages for their breach. To extend the right to work, but to withhold the remedy to collect compensation, would be as much of a mockery as to present the shell after extracting the kernel. The definition of '' trading '' in the act under consideration is very comprehensive, but I am not disposed to find within it any terms sufficiently elastic to include the occupation or the contracts of a singer in opera. If I should so find, the dictionaries would probably confute me. But, even if it should be assumed that plaintiff is both an enemy and a trader, I cannot find that it was the intention of either congress or the president to deny her the exercise of the same civil rights enjoyed by neutral aliens. If there is any such provision, it contradicts the assurance that she shall '' be accorded the consideration due to all peaceful and law-abiding persons.'' With only a few exceptions the nations of all the earth both advocate and practice many ameliorations of the acerbities of war. In that endeavor this nation is not backward. No limitation is placed upon the freedom of resident subjects of a foreign state with which we are at war, unless that limitation is deemed necessary to withhold from that enemy the aid or comfort which may advance his cause. Mere technical or arbitrary rules are neither enacted,

nor, when found in ancient usage, enforced. How could our own plans be served or those of Germany defeated or impaired by closing against the plaintiff the doors of our courts? In 1913, over a year before hostilities commenced, she and her husband abandoned the city of Berlin and came to New York. She came to fulfill the terms of a five-year contract executed in 1911. She has two homes in this state, one in the city and one in the Adirondacks, where their child was born. She has performed all the duties required of her by the governments of the United States and the state of New York, and has been subjected to taxes on her income, as appears from deductions withheld in the payment of her salary by the defendant. At the beginning of the fifth and best-paid year, she is informed that, "owing to the existing conditions of war, we can no longer avail ourselves of your services." Assuming that the rupture was justified, the government cannot be injured by a judgment to that effect. Assuming that plaintiff was entitled to complete her contract, the damages so collected cannot be utilized on any sea or battle front. In order to be so applied it would be necessary to place the funds within the potential control of the German government. If we assume, contrary to the presumption of innocence, that plaintiff might use the funds in some of the many ways by which this country has been injured in its gigantic work of preparation, still the principle would remain; for nations deal not with other nationals, but with the states to which they owe allegiance. Under our laws neither plaintiff nor her husband can go to Germany, and the chances of sending money there are negligible. Furthermore, I think this motion should be denied, in pursuance of the public law of nations. As administered in England, that law has been applied as follows: " The latest adjudication upon the enemy's

right to sue is *Princess Thurn and Taxis* v. *Moffitt* (1914, 31 Times L. R., 24), where Sargent, J., held that the subject of an enemy State who was registered under the Aliens Restriction Act of 1914 as an alien and subject of an enemy State, is entitled to sue in the King's Courts. This decision is, in our opinion, clearly right. Such an alien is resident here by tacit permission of the Crown (*Porter* v. *Freudenberg,* L. R. 1915, 1 K. B., 857, 868). This man's position as alien enemy is quite clear upon the authorities. * * * The plaintiff is in protection, and he is entitled to enforce any civil rights he may have in this country. As a prisoner of war his position, upon the authorities, is quite clear. He is in no worse position than any other individual who is in custody for an offense. Therefore, in whatever way his position is considered, he is entitled, upon the authorities, to maintain an action (*Schaffenius* v. *Goldberg,* L. R. 1916, 1 K. B. 284, 303).'' Vice-Chancellor Lane, of New Jersey, wrote as follows: '' The modern trend is to discourage interference with property rights, whether of friends or enemies, in time of war, except so far as may be necessary to effectively accomplish the objects of the war. * * * To shut the door of the court in the face of an alien enemy resident here would be a distinct violation of not only the spirit but the letter of this proclamation.'' *Posselt* v. *D'Espard,* 100 Atl. Repr. 893. By The Hague Convention it was forbidden '' to declare abolished, suspended or inadmissible in a court of law the rights and actions of the nationals of the hostile parties.'' 36 U. S. Stat. at Large, pt. 2, 227. The vice-chancellor of New Jersey, above quoted, stated *obiter* that an alien enemy domiciled in his own country should be enabled to sue here as well as the alien resident. The *dictum* is founded on the liberal terms of the proclamation. That phase of the ques-

tion, however, is not material here, and it has been otherwise decided by me in this court (*Norddeutsche Ins. Co. of Hamburg, Germany,* v. *John L. Dudley, Jr., Co.,* N. Y. Law Journal, January 11, 1918) on the authority of *Rothbarth* v. *Herzfeld,* decided by the Appellate Division and reported in 179 App. Div. 865. And on the same subject the Canadian court wrote as follows: " I adopt the opinion of Kent, C. J., in the case of *Clarke* v. *Morey* (10 Johnson, 68). * * * In this judgment it is said that the result would be otherwise if the foreigner resided in the enemy country. The reason of this rule is founded upon this, that our courts in time of war cannot enforce the execution of contracts, the effect of which would be to aid the enemy. * * * If the judgment condemns the British citizen to pay it, there is a presumption that this sum will aid the enemy. But this presumption does not exist in the case of a foreigner dwelling in our country; there would then be a presumption that the sum recovered would aid our own country." *Viola* v. *Mackenzie Mann & Co.,* 24 Dom. L. R. 208. While I should be inclined to hold that the plaintiff is entitled to maintain her action on the ground that within the purview of the act she is not an alien enemy engaged in trade subject to suspension by the federal government I prefer to deny the motion on the broad ground that the resident subjects of an enemy nation are entitled to invoke the process of our courts so long as they are guilty of no act inconsistent with the temporary allegiance which they hold for this government.

Motion denied.