MARGARETE ARNDT-OBER, Respondent, *v.* METROPOLITAN OPERA COMPANY, Appellant.

First Department, April 5, 1918.

**War — aliens — right of resident alien enemy to sue — Trading with the Enemy Act construed.**

A non-resident alien enemy may not prosecute an action in our courts during the war.

But an alien who is a subject of an enemy, but who resides in this country, may maintain an action in our courts.

The word " residence " as used in the Trading with the Enemy Act does not mean legal residence in the sense that an alien enemy residing here

is deemed to be resident in the enemy country, but on the contrary means residence as ordinarily understood, and said Federal act being drafted in the light of the common law, a woman who is a subject of an enemy country, but who resides in this State, may sue and be sued in our courts so long as she conducts herself properly and continues to reside here.

Judicial decisions and Trading with the Enemy Act analyzed, per SHEARN, J.

APPEAL by the defendant, Metropolitan Opera Company, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 31st day of January, 1918, denying defendant's motion to dismiss the complaint on the ground that plaintiff is an alien enemy.

*Edmond E. Wise* of counsel [*Isaac Lande* with him on the brief; *Wise & Seligsberg*, attorneys], for the appellant.

*Benno Loewy*, for the respondent.

SHEARN, J.:

This appeal involves the right of a resident subject of a country engaged in war against our own country to maintain an action in our courts. We have recently decided in *Rothbarth* v. *Herzfeld* (179 App. Div. 865; affd., 223 N. Y. 578), following an unbroken line of authorities, that a non-resident alien enemy may not prosecute an action in our courts during the war. That decision was based upon grounds of public policy, which forbids the doing of acts that will be or may be to the advantage of the enemy state by increasing its capacity for prolonging hostilities through additions to the credit, money or goods or other resources available to individuals in the enemy state, and upon the ground that permission to prosecute, under such circumstances, would violate the provisions of the Trading with the Enemy Act, approved October 6, 1917. (40 U. S. Stat. at Large, 411, chap. 106.) A radically different situation, however, is presented in the case of one who resides, not in the enemy country, but in our own country. In the case of a resident, the right to maintain an action in our courts is clearly established, both in principle and by authoritative decisions. The leading case in this country is *Clarke* v. *Morey* (10 Johns. 69). It was there held, as the headnote correctly states, that: "*Aliens*, resident in the United

States at the time of war breaking out between their own country and the United States, or who come to reside in the United States after the breaking out of such war, under an express or implied permission, may sue and be sued, as in time of peace; and it is not necessary, for that purpose, that such aliens should have letters of safe conduct, or actual license to remain in the United States, but a license and protection will be implied, from their being suffered to remain, without being ordered out of the United States by the executive."

Chief Justice KENT delivered the opinion of the court and said: " The disability is confined to these two cases: 1. Where the right sued for was acquired in actual hostility, * * * 2. Where the plaintiff, being an alien enemy, was resident in the enemy's country; * * * It was considered in the common pleas, at Westminster, as a settled point (HEATH, J. and ROOKE, J. in *Sparenburgh* v. *Bannatyne*, 1 Bos. & Pull. 163) that an alien enemy under the king's protection, even if he were a prisoner of war, might sue and be sued. This point had long before received a very solemn decision in the case of *Wells* v. *Williams* (1 Ld. Raym. 282. 1 Lutw. 34. S. C. 1 Salk. 46). It was there decided that if the plaintiff came to England before the war, and continued to reside there, by the license and under the protection of the king, he might maintain an action upon his personal contract; and that if even he came to England after the breaking out of the war, and continued there under the same protection, he might sue upon his bond or contract; and that the distinction was between such an alien enemy, and one *commorant* in his own country. The plea, in that case, averred that the plaintiff was not only born in France, under the allegiance of the French king, then being an enemy, but that he came to England, without any safe conduct, and the plea was held bad on demurrer. It was considered, that if the plaintiff came to England in time of peace, and remained there quietly, it amounted to a license, and that if he came over in time of war, and continued without disturbance, a license would be intended. * * * In the case before us, we are to take it for granted (for the suit was commenced before the present war) that the plaintiff came to reside here before the war, and no letters of safe conduct were, therefore,

requisite, nor any license from the president. The license is implied by law and the usage of nations; if he came here since the war, a license is also implied, and the protection continues until the executive shall think proper to order the plaintiff out of the United States * * *. Until such order, the law grants permission to the alien to remain, though his sovereign be at war with us. A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity.

" The right to sue, in such a case, rests on still broader ground than that of a mere municipal provision, for it has been frequently held that the law of nations is part of the common law. By the law of nations, an alien who comes to reside in a foreign country, is entitled, so long as he conducts himself peaceably, to continue to reside there, under the public protection; and it requires the express will of the sovereign power to order him away."

Lord READING, C. J., in the Court of Appeal, in the recent case of *Porter* v. *Freudenberg* (L. R. [1915] 1 K. B. 857) elaborately and most convincingly reviewed the authorities and considered the subject from every point of view. It was therein decided that the test of a person being an alien enemy is not his nationality, but is the place where he resides and carries on business. Lord READING said: " Trading with a British subject or the subject of a neutral State carrying on business in the hostile territory is as much assistance to the alien enemy as if it were with a subject of enemy nationality carrying on business in the enemy State, and, therefore, for the purpose of the enforcement of civil rights, they are equally treated as alien enemies. It is clear law that the test for this purpose is not nationality but the place of carrying on the business: *Wells* v. *Williams*, 1 Ld. Raym. 282; *McConnell* v. *Hector*, per Lord ALVANLEY, C. J., 3 Bos. & P. 113; *Janson* v. *Driefontein Consolidated Mines*, L. R. [1902] A. C. 505, per Lord LINDLEY. When considering the enforcement of civil rights a person may be treated as the subject of an enemy State, notwithstanding that he is in fact a subject of the British Crown or of a neutral State. Conversely a person may be treated as a subject of the Crown

notwithstanding that he is in fact the subject of an enemy State. As Lord LINDLEY said in *Janson* v. *Driefontein Consolidated Mines* (*supra*): ' When considering questions arising with an alien enemy it is not the nationality of a person, but his place of business during war that is important. An Englishman carrying on business in an enemy's country is treated as an alien enemy in considering the validity or invalidity of his commercial contracts.  *  *  *  Again the subject of a State at war with this country, but who is carrying on business here or in a foreign neutral country, is not treated as an alien enemy; the validity of his contracts does not depend on his nationality, nor even on what is his real domicile, but on the place or places in which he carries on his business or businesses.'  *  *  *  In ascertaining the rights of aliens the first point for consideration is whether they are alien friends or alien enemies. Alien friends have long since been, and are at the present day, treated in reference to civil rights as if they were British subjects, and are entitled to the enjoyment of all personal rights of a citizen, including the right to sue in the King's Courts. Alien enemies have no civil rights or privileges unless they are here under the protection and by permission of the Crown: Blackstone, 21st Ed., vol. 1, c. 10, p. 372.  *  *  *

" In Walford's treatise on the Law respecting Parties to Actions, published 1842, there is a chapter in vol. 1, p. 647, dealing with disabilities of civil origin which well repays close and diligent study. When treating of alien enemies the learned author at p. 650 thus states the law: ' Alien enemies are distinguishable according as they are under the King's special protection or not. If an alien enemy came here under a safe conduct or is commorant here by the King's license and under his protection he seems to stand in the same position as to the right of maintaining actions in our Courts as an alien friend, a right of suing being an incidental right to protection ' — that is, he is no longer under the disability attaching to an alien enemy."

The decision in *Porter* v. *Freudenberg* (*supra*) was followed by *Schaffenius* v. *Goldberg* (L. R. [1916] 1 K. B. 284) in which the court upheld the right to sue in the case of one born in Germany, resident and carrying on business in England,

unnaturalized, registered as an enemy alien and actually interned within the realm as a civilian prisoner of war. It appeared, of course, that the internment was not due to any misconduct. So, too, it was held in the case of *Princess Thurn and Taxis* v. *Moffitt* (L. R. [1915] 1 Ch. 58) that an alien enemy's wife resident in the United Kingdom and duly registered under the Aliens Restriction Act could maintain an action in the courts of England for the purpose of asserting her individual rights, notwithstanding the fact that her husband " is an alien enemy as being a subject of Austria-Hungary or that he is abroad and probably engaged in fighting against this country." The court said: " The law applicable to the circumstances is in my opinion correctly stated in Hall's International Law, 6th ed. p. 388, as follows: ' When persons are allowed to remain, either for a specified time after the commencement of war, or during good behaviour, they are exonerated from the disabilities of enemies for such time as they in fact stay, and they are placed in the same position as other foreigners, except that they cannot carry on a direct trade in their own or other enemy vessels with the enemy country.' "

It appears from the affidavits that the plaintiff, who is an opera singer by profession, came to this country first in November, 1913, and has continuously lived here since having made but two trips to Europe in the intervening four years. She resides at 840 West End avenue in the borough of Manhattan, with her husband and her only child, who was born at her summer home in the Adirondack mountains on September 13, 1916. She was enrolled in the military census and inventory of 1917, taken by order of the Governor, as was her husband.

In proclaiming a state of war on April 6, 1917, the President defined the persons " who for the purpose of this proclamation and under such sections of the Revised Statutes* are termed alien enemies " to be " all natives, citizens, denizens, or subjects of Germany, being males of the age of fourteen years and upwards, who shall be within the United States and not catually naturalized." It may be noted that the plaintiff

---

*See U. S. R. S. §§ 4067–4070.— [REP.

is not within the definition.  In his proclamation, directing and proclaiming the conduct to be observed on the part of the United States toward alien enemies, the President declared that " so long as they shall conduct themselves in accordance with law, they shall be undisturbed in the peaceful pursuit of their lives and occupations and be accorded the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States."   (40 U. S. Stat. at Large, ——, ——.)  Thereafter necessary restrictions were duly embodied in the Trading with the Enemy Act, approved October 6, 1917.   Section 2 thereof (40 U. S. Stat. at Large, 411) provides:

" Sec. 2. That the word ' enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act —

" (a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory."

The only prohibition contained in the act against prosecuting in our courts is directed against alien enemies as thus defined.

But it is contended by the defendant that residence, as used in the Trading with the Enemy Act, means legal residence or domicile and not residence as ordinarily understood, and that the court would be warranted from the proof in concluding that the legal residence or domicile of the plaintiff is still in Berlin, notwithstanding her actual residence of more than four years in this country.  It is not necessary to determine whether the plaintiff has intentionally and definitely abandoned her domicile in Berlin, for in our opinion the plaintiff does not reside within enemy territory but is a resident of the State of New York, within the meaning of the Trading with the Enemy Act and all decisions relating to this subject of the right to sue.   The Trading with the Enemy

Act was drafted in the light of the common law as announced by the greatest authorities in this country and in England, and its purpose was in part to carry out the public policy of preventing aid to the enemy. If it had been intended to base the test of right to sue upon nationality instead of residence in the enemy territory, such a change in the policy of the law would have been indicated by appropriate words. Such a construction would be in part subversive of the purpose of the act, for it would permit suits to be maintained by persons whose legal residence or domicile was in this country but who were residents and doing business in Germany. This would clearly tend to strengthen enemy credit and increase enemy resources. Further, such a construction would be directly contrary to the decision in *Princess Thurn and Taxis* v. *Moffitt (supra)*, for there, of course, the legal residence and domicile of the plaintiff was in Austria-Hungary with her husband, although her residence, as the term is ordinarily used, was in England. Finally, such a construction would be entirely out of harmony with the entire line of decisions above referred to, all of which make residence, in the sense of sojourn or presence, within the enemy territory the basis of exclusion from the right to prosecute an action in our courts.

It, therefore, appears that the plaintiff is not an enemy alien within the President's proclamation, but that, if she were, she would be entitled under that proclamation to maintain a suit here so long as she was guilty of no misbehavior during her residence; that the plaintiff is not an alien enemy within the terms of the Trading with the Enemy Act; that she is here virtually under the license of the President, and is, therefore, entitled, so long as she conducts herself properly, to continue to reside here, under the public protection; and that, as Chief Justice Kent said, " A lawful residence implies * * * a capacity to sue and be sued."

The law being clear, we feel constrained to affirm the order appealed from, except in so far as it limits the defendant's time within which to make such other motions in respect to the complaint as it may be advised.

The order appealed from is modified by extending the defendant's time to answer or demur to the complaint, or to make such motion in regard to the complaint as it may be

advised, until ten days after service with notice of entry of the order to be entered upon this decision, and as so modified is affirmed, without costs.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concurred.

Order modified as stated in opinion, and as modified affirmed, without costs.