BERTHOLD KAUFMAN, Plaintiff, *v.* HELMUTH EISENBERG and CITY OF NEW YORK, Defendants.

Supreme Court, Trial Term, New York County, January 19, 1942.

*Milton W. Sametz* [*Myron M. Behrman* of counsel], for the plaintiff.

*William J. McArthur* [*Murray M. Katz* of counsel], for the defendant Helmuth Eisenberg.

*William C. Chanler,* Corporation Counsel [*Benjamin M. Gold* of counsel], for the defendant City of New York.

EDER, J. Reconsidered ruling *sua sponte.* When this cause was called for trial on January sixth, the court was informed of the ruling in *Ex parte Colonna* (—— U. S. ——; 86 L. Ed. 357) that an alien enemy was precluded from prosecuting any action for the duration of the war; the opinion cited *Rothbarth* v. *Herzfeld* (179 App. Div. 865; affd., 223 N. Y. 578.) The trial of this action was thereupon ordered stayed until the end of the war, the court being advised that plaintiff was an alien enemy, being a national of Germany. However, upon further consideration, it appears that the mentioned cases were dealing with the status of a non-resident alien enemy while the plaintiff in the instant case is a resident alien enemy and a different rule is, therefore, applicable.

At common law a resident alien enemy could sue and prosecute in our courts (*Clarke* v. *Morey,* 10 Johns. 69) and a distinction was observed between a resident alien enemy and a non-resident alien enemy, the latter being unequivocally refused the right to sue in our courts. (*Rothbarth* v. *Herzfeld, supra.*) As to a resident alien enemy the weight of authority indicates that he will not be precluded from suing in our courts or proceeding with a suit already begun and pending, in the absence of statute or presidential proclamation denying such right. (*Arndt-Ober* v. *Metropolitan Opera Co.,* 182 App. Div. 513; *Hughes* v. *Techt,* 188 id. 743; affd., 229 N. Y. 222; certiorari denied, 254 U. S. 643; *Schulz Co.* v. *Raimes & Co.,* 99 Misc. 626; affd., 100 id. 697. See, also, Huberich on Trading with the Enemy [1918 ed.] —" Civil Rights and Disabilities of Alien Enemies," pp. 191–195.)

Subdivision (b) of section 7 of the Trading with the Enemy Act ([1917] U. S. Code Ann. tit. 50, Appendix, p. 209), which is the suspensory enactment, so far as here pertinent, provides: " Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war, except as provided in section ten hereof; *Provided, however*, That an enemy or ally of enemy licensed to do business under this Act may prosecute and maintain any such suit or action so far as the same arises solely out of the business transacted within the United States under such license and so long as such license remains in full force and effect: *And provided further*, That an enemy or ally of enemy may defend by counsel any suit in equity or action at law which may be brought against him."

Of course, where the situation involves a transaction under license, the restraint otherwise imposed by subdivision (b) of section 7 is inoperative and the alien enemy may sue with respect to matters which stem from the licensed transaction; in such an instance it is said that " the enemy party thereto is *pro hac vice* in the position of an alien friend." (Huberich, *supra*, p. 188.)

" Enemy " is defined in section 2 of the act, subdivisions (a), (b) and (c) thereof being the relevant provisions, which read as follows:

" The word ' enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act —

" (a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

" (b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

" (c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term ' enemy.' "

The plaintiff here obviously does not come within subdivisions (a) and (b). He might and could be brought within the purview of

subdivision (c) by presidential proclamation to that effect as was done in the first World War, a feature alluded to in the opinions in the *Arndt* and *Hughes* cases (*supra*).

The President has promulgated rules and regulations governing the conduct of alien enemies resident in the United States (U. S. Code, tit. 50, §§ 21–23, " Alien Enemies "), but this court is unaware of any proclamation by the President made by virtue of the power conferred by subdivision (c), to include within the term " enemy " nationals of Germany resident in this country.

The general right of every resident, whether citizen or alien, to freely resort to the courts of justice has been fully recognized. In the exercise thereof early distinction was drawn between alien friend and alien enemy in regard to capacity to sue though it appears to have been for a time lost sight of. (Huberich, *supra*, pp. 191, 192.) But irrespective of this, the right of an alien or alien enemy to resort to our courts clearly may be curtailed or entirely withheld by legislative action or authorized executive proclamation. (*Arndt* and *Hughes* cases, *supra*.) " Whether that right is to be exercised is a matter of policy." (*Posselt* v. *D'Espard*, 87 N. J. Eq. 571; 100 A. 893; Huberich, *supra*, p. 194, " Enemy Plaintiffs.")

The rule which prevailed at common law did not debar a resident alien enemy from resorting to our courts and it has been said that the Trading with the Enemy Act was enacted with knowledge and recognition of the status and rights as possessed by a resident alien enemy under the common law — " was drafted in the light of the common law." (*Arndt* case, *supra*.) This view finds confirmation in the promulgation of presidential proclamations during World War I, defining and including resident alien enemies in the term " enemy " and in the further fact that section 2 of the act does not include in the term " enemy " a resident alien enemy.

Assistant Attorney-General Warren, who drafted the act, in hearings before the subcommittee on House Resolutions 4960 130, 131, in stating the purposes of the act, said: " It was my intent in drafting this bill to make it as little restrictive of American commerce and as liberal toward the enemy private person as was compatible with the safety of the United States and with justice to American interests. * * * "

In his comments with respect to the purposes of this statute (12 Amer. Journal Internat. Law [1918], p. 676), Mr. Warren says that it was intended that the common law should prevail " in all matters not within the scope of its enactment." Professor Huberich, in his admirable work on Trading with the Enemy, in the branch thereof dealing with the purposes of the act and rules of interpretation, says (p. 46):

" From the language employed in the Act as well as from the evident intent of the framers of the bill and the legislative debates, the general purposes of the Act, in so far as the Act relates to the trade with and the property of enemies, are the following:

" 1. To interdict all intercourse, commercial or non-commercial, with all persons who are enemies or allies of enemy within the meaning of the Act, and to prohibit the doing of acts tending to the financial benefit of such persons.

" 2. To leave unaffected the property and other civil rights of resident alien enemies, including corporations organized under the laws of any State of the United States, whose stockholders are wholly or in part alien enemies.

" 3. To conserve and protect through governmental agencies, and not to confiscate, the tangible and intangible property of non-resident alien enemies, in such manner, however, that such property may not be used as the basis of credit in foreign countries by the enemy owner.

" 4. To leave in force the common law provisions regarding the effect of war on contracts, statutes of limitation, rights to devises and bequests, and rights as parties to actions, except in so far as the Act mitigates the rigor of the common law.

" 5. To provide for a liberal system of licensing transactions within the letter, but not within the spirit of the Act."

Mr. Warren, speaking of the term " enemy," says of the act: " It provides for a large extension of the term ' enemy ' by the President whenever he shall deem that conditions demand such extension."   (12 Amer. Journal Internat. Law [1918], p. 676.)

From this background it seems clear that the disability of the right of alien enemies to institute or maintain judicial proceedings is predicated, basically, on the enforcement of a national policy, so clearly stated by GOULD, J., in *Bonneau* v. *Dinsmore* (23 How. Pr. 397) as follows: " The whole ground of excluding a public enemy from our courts is one exclusively of public policy, and whenever public policy would carry the rule, the courts should be bound by it."

It seems apparent from the foregoing that the act affects only the class or type of alien enemy which by its express language it proscribes and is not of omnibus application.   Considering, therefore, the common-law rule and the features as to the purposes of the act and that the right of a resident enemy alien to sue in the civil courts like a citizen has been accorded recognition under the generally accepted rule (See Meares on Trading with the Enemy Act, Ann. [1924], pp. 56–62, notes 16, 17, 18, 19, 20, 22), it is my view that until it is manifested by legislative expression or presi-

dential pronouncement that the right of a resident alien enemy to sue or prosecute in our courts has been withdrawn, the court must recognize and enforce the right, and this, irrespective of any personal views which the judge may entertain that such a right should be denied to all alien enemies.

Another feature to which reference should be made is with regard to the nature of the action, as it is affected by the statute. The action herein is one in tort; the Trading with the Enemy Act, as its title implies, relates to trade; the act, in section 2, defines the term " to trade " as follows:

" The words ' to trade,' as used herein, shall be deemed to mean —

" (a) Pay, satisfy, compromise, or give security for the payment or satisfaction of any debt or obligation.

" (b) Draw, accept, pay, present for acceptance or payment, or indorse any negotiable instrument or chose in action.

" (c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

" (d) Buy or sell, loan or extend credit, trade in, deal with, exchange, transmit, transfer, assign, or otherwise dispose of, or receive any form of property.

" (e) To have any form of business or commercial communication or intercourse with."

Examination of the cases indicates that the act is not intended to be operative as to or to include non-commercial intercourse (Huberich, *supra*, p. 98, and cases there cited), *Kershaw* v. *Kelsey* (100 Mass. 561) and *Coolidge* v. *Inglee* (13 id. 26) being apt illustrations. The statute does not appear to include such a suit in the definition.

For the reasons stated this court of its own motion vacates the stay previously granted and it is ordered that this cause be restored to the day calendar for trial for the 26th day of January, 1942.