## THE OCEAN GIFT.

## MANAKA v. MONTEREY SARDINE IN-DUSTRIES, Inc., et al.

### No. 21772W.

District Court, N. D. California, S. D.

July 2, 1942.

626

Single, Bryant, Cook & Hays, of San Francisco, Cal., for plaintiff.

Hudson, Martin & Ferrante and Webster Street, all of Monterey, Cal., for defendants other than Del Mar Canning Co.

John Milton Thompson, of Monterey, Cal., for defendant Del Mar Canning Co.

Russell Zaches, of Monterey, Cal., for third party defendant.

Seine & Line Fishermen's Union, et al.

JAMES ALGER FEE, District Judge.

Liability in this action was heretofore decided by this court[1] and a reference made for the purpose of determining the amount of damages. The question before the court now is as to the entry of a final judgment. The difficulty arises in the fact that while the plaintiff, himself, is an American citizen by birth, six of the crew of the vessel "Ocean Gift" are alien born Japanese, who are, of course, not citizens. In view of the fact that each of the crew has his lay or share of the amount earned by the vessel, each of these Japanese has morally, if not legally, a share in the recoveries made by the Captain on behalf of the vessel and crew. These alien Japanese are not technically parties to this action. There is no trust fund or res. The right of Manaka, the plaintiff, is personal. Their rights against him, if any, are also personal.

There seems to be no question under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c,[2] that the court might enter a judgment for the amount of recovery, less the appropriate share which will logically come to each of

---

[1] Manaka v. Monterey Sardine Industries, Inc., D.C., 41 F.Supp. 531.

[2] Rules 42(b) and 54(b).

these seamen, and hold the balance in abeyance until after the war is concluded.[3] Although counsel for plaintiff expresses himself as willing to accept this solution, it should not be forced upon him, unless the law requires such result.

The Supreme Court of the United States has recently handed down its opinion in Ex parte Don Ascanio Colonna.[4] There the petition of the Italian Ambassador for a writ of prohibition and mandamus, directed to the United States District Court for the purpose of clothing with sovereign immunity a vessel, subject to litigation in that court, as the property of the Italian Government, was denied. This ruling was based upon the ground that the government of any nation with which the United States is at war is an enemy.[5] The nationals of a country with which the United States is at war, who are residing in the country of their citizenship, cannot use the courts of the United States to prosecute actions either against citizens of this country or other foreigners, according to well-established doctrine.[6]

Commencing with an intimation in a case pending at Hilary Term of 1454 in England,[7] it has been well-settled that an alien invited to, and with sovereign promise of protection residing in, a country which is at war with the country of his nationality, nevertheless is entitled to maintain action in the courts of the country of his residence to protect his property. As to this proposition so stated there was little debate in the courts until a much later period. The position of an enemy alien[8] and, indeed, of an alien[9] without license or safe-conduct, was seriously questioned, in earlier times.

This notion of invitation and safe-conduct so early suggested because of commercial necessities in order to avoid the rightless status of an alien proved extremely tenacious of life. The implication of such invitation and sovereign safe-conduct from mere presence of the alien in England was early postulated and generously confirmed by decision.[10] In the United States this traditional and historic policy was well-expressed by Alexander Hamilton in 1795 as follows: "* * * Whenever, therefore, a government grants permission to foreigners to acquire property within its territories, or to bring and deposit it there, it tacitly promises protection and security."[11]

This utterance is but an echo of the doctrine of the English cases as is shown by the leading case in this country,[12] which is squarely founded upon the ancient rule as interpreted in Wells v. Williams, supra, which is cited therein about the time of the temporary repudiation of its authority in the courts which originated the theory.

The right to sue in England has been accorded in the English courts[13] and in the tribunals of the associated common-

---

[3] The court is not under any difficulty such as faced the court in Speidel v. N. Barstow Co., D.C., 243 F. 621, since all parties are resident here and a complete segregation of amounts of recovery can be made.

[4] 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379.

[5] 50 U.S.C.A.Appendix § 7(b).

[6] See Speidel v. N. Barstow Co., supra; Janson v. Driefontein Consolidated Mines, [1902] A.C. pp. 505–6.

[7] See Porter v. Freudenberg [1915] 1 K.B. 857, 870, where reference is made to the statements of Ashton, J. The holding appears in Y.B. 32, Henry VI.Hil. pl. 5, as follows: "Si un alien come Lumbard, Galiman, ou tiel marchant que vient icy per licence et sauf conduit et prend icy en Longres, ou ailours, un meason pro le temps, si ascun debruse le meason, et prend ses biens, il aura action de trespass; nes s'il soit enemy le Roy, et vient eins sans licence ou sauf conduit auter est".

[8] Calvin's Case (1609) 7 Co.Rep. at p. 182.

[9] Littleton on Tenures, Sec. 198, indicated that an alien had no rights of action in the common law courts. Upon this point Holdsworth says: "We shall now see that, even when Littleton and Marowe were writing, it was a view of the law which was being repudiated by the courts, and that it is very doubtful if it was ever fully accepted as law. * * * If this is correct, it may well be that Coke was right when, in commenting on Littleton, he maintained that at common law the incapacity of the alien to bring any kind of action applied only to alien enemies, and that alien friends were only incapacitated from bringing real or mixed actions." History of English Law, Volume Nine, pages 94, 95.

[10] Wells v. Williams (1697) 1 Lord Raymond 282.

[11] Camillus Letters, Nos. 18, 19.

[12] Clarke v. Morey, 10 Johns., N.Y., 69.

[13] Porter v. Freudenberg, supra; Prin-

wealths[14] modernly, although there have been variations. Even the internment of an enemy alien does not deprive him of the right to sue regarding property rights there,[15] but the ancient notion that permission to reside in the country has something to do with the right to sue even today seems to cling about the English decisions. There is a broad declaration that where an enemy alien had registered under act of Parliament the intention to permit her to remain in the country was established, and as a result "she had a clear right to enforce that right in the courts of this country notwithstanding the existence of a state of war." [16]

The early decisions in the United States clearly permitted aliens from enemy countries resident here to prosecute or defend actions in the courts, although there is still the savor of permitted residence about these opinions.[17] The trend of decision remained the same during the last World War. The policy of the United States in that conflict,[18] however, as in this, has to a certain extent been modified by the incidence of economic factors in modern war. It has become of such vital and transcending importance to marshal all resources available for the conflict of the Titans, such as rages today, that during the first World War, as in this, the United States put into protective custody the property of alien enemies and abridged remedies relating thereto. However, the course of decision remains the same under the present law and an alien who owes allegiance to a foreign prince, potentate or power but who resides here can still sue in our courts.[19]

But it is strongly urged that, although the statute, itself, does not mention resident aliens[20] within the classification of those who are prohibited from maintaining action in the courts,[21] the President by proclamation has included them within the text of the statute. It is to be noted at the outset that the purpose of these proclamations was not to introduce classifications within the text of the Trading with the Enemy Act,[22] 50 U.S.C.A.Appendix, § 1 et seq. If it had been so, specific reference would have been made to that statute. It is also to be noted that there are other persons who are likewise included, such as aliens of Italian and German nationality. If that be the intent of the proclamation, the other courts who have ruled with regard to such classes of aliens have been wrong.

In the absence of a clear declaration upon the part of the Executive Department of the government that it is intended to deprive Japanese aliens residing in this country of the right to recourse to its courts in this type of litigation, this court will, in view of the history of the opinions and legislation, draw no such inference with reference to persons who are only indirect beneficiaries.

The very statute upon which reliance is placed provides for protective custody of property belonging to alien enemies situate within the United States. Access to this property by them is covered by licensing restrictions. Any funds which may finally be paid upon this judgment can be covered to prevent use against the

---

cess Thurn and Taxis v. Moffitt, [1915] 1 Ch. 58; Schaffenious v. Goldburg, [1916] 1 K.B. 284.

14 Volke v. Rotunda Hospital, [1914] 2 I.R. 543; Bassi v. Sullivan, 32 Ontario Law Reps. 14; Harasymczuk v. Montreal Light, Heat & Power Co., Rap.Jud. Quebec, 25 B.R. 252.

15 Schaffenius v. Goldburg, supra; Harasymczuk v. Montreal Light Heat & Power Co., supra.

16 Princess Thurn, supra.

17 Clarke v. Morey, supra; Otteridge v. Thompson, Fed.Cas.No.10,618, 2 Cranch C.C. 108. See Parkinson v. Wentworth, 11 Mass. 26; Seymour v. Bailey, 66 Ill. 288, 301.

18 State ex rel. Constanti v. Darwin, 102 Wash. 402, 173 P. 29, L.R.A.1918F, 1012; Arndt-Ober v. Metropolitan Opera Company, 102 Misc. 320, 169 N.Y.S. 304,

affirmed 182 App.Div. 513, 169 N.Y.S. 944.

19 Uberti v. Maiatico, D.C., 44 F.Supp. 724; Anastasio v. Anastasio, D.C., 44 F. Supp. 725; Stern v. Ruzicka, D.C., 44 F.Supp. 726; Verano v. DeAngelis Coal Co., Inc., D.C., 44 F.Supp. 726. The same point was raised in Societa Anonima Partecipazioni Industriali Commerciali et al. v. Luckenbach S. S. Co., 9 Cir., 127 F.2d 86, but is not directly passed upon in the opinion.

20 50 U.S.C.A., Appendix § 2.

21 50 U.S.C.A., Appendix § 7.

22 The proclamation relating to conduct of "natives, citizens, denizens or subjects of the Empire of Japan" of December 7, 1941, No. 2525, purports to be issued under Sections 21, 22, 23 and 24 of Title 50 United States Code Annotated.

629

United States, or for giving aid or comfort to the Empire of Japan.[23]

The court grants the motion to stay for the limited purpose only of giving notice to the appropriate authorities of the government of the United States of the impending entry of judgment herein. The court, if necessary, will direct that execution be not issued upon said judgment until appropriate steps have been taken to give to the government of the United States the full power to control any proceeds thereof.

Findings and judgment may be prepared, but will be held in abeyance until the appropriate safeguards have been taken.

---

[23] See Kaufman v. Eisenberg, 177 Misc. 939, 32 N.Y.S.2d 450; See Brown v. J. P. Morgan & Co., Inc., 177 Misc. 763, 31 N.Y.S.2d 815.